Cecilia KARIKAS, Appellant

v.

UNITED STATES of America, Appellee.

No. 16354.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 2, 1961.

Decided Nov. 9, 1961.

Mr. Robert L. Ackerly, Washington, D. C., for appellant.

Mr. Robert Brewer Norris, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., Charles T. Duncan, Principal Asst. U. S. Atty., and Frederick G. Smithson, Asst. U. S. Atty., were on the brief, for appellee. Mr. Carl W. Belcher, Asst. U. S. Atty., at the time the record was filed, entered an appearance for appellee.

Before WILBUR K. MILLER, Chief Judge, and EDGERTON and FAHY, Circuit Judges.

WILBUR K. MILLER, Chief Judge.

On August 6, 1959, a young woman who gave her name as Anne Whiteside appeared at the Washington office of Pan American World Airways and presented for redemption six unused tickets from New York to Rome, and return from Rome to New Orleans via New York. The tickets bore validating stamps indicating they had been issued by Delta Travel Bureau of New Orleans. Each showed on its face a cost of $1,194.50.

Miss Whiteside asked that the entire refund be made by one check payable to International Students Relations Committee, but was told that could not be done; that the air line's rule was to draw separate checks to the persons whose names appeared on the tickets. Accordingly, six checks dated August 6, 1959, for $1,194.50 each, payable respectively to Hiriam Schonenberg, Ling Chen, Peter Simmons, Jr., Donald Lee, Saul Leherman and Roland Hodges, drawn on Pan American's Refund Account in Bankers Trust Company of New York, were prepared and delivered to Anne Whiteside.

A day or two later, Investment Bankers of America, a stock brokerage firm of the District of Columbia, received through the mail a purchase order form dated August 7, 1959, requesting that three stocks be purchased. The form bore the signature, "Anne Whiteside," under which was typed, "Treasurer, Students' Committee Investment Club, International Students Relations Committee," and attached to it were the six refund checks endorsed in blank by signatures purporting to be those of the payees. The brokerage firm was able to buy only one of the three stocks mentioned—this at a cost of $200—because the other two were selling at prices higher than those specified in the order. So the customer had a credit balance of $6,967. On August 18, Anne Whiteside closed the account and received Investment Bankers' check for $6,967, payable to her as Treasurer, Students' Committee Investment Club. A certificate for the one stock purchased had already been mailed to her. The six refund checks bearing the endorsement of Investment Bankers of America cleared in due course and were charged to Pan American's account by the bank on which they were drawn.

Some four months before the redemption just described, a representative of Pan American had picked up from Tour Travel International, a travel bureau which had an office in the District of Columbia, certain blank tickets, or "ticket stock," which it had theretofore consigned to the bureau for completion, validation and sale in the ordinary course of business. He issued a receipt showing the serial numbers of the blank tickets so collected from the bureau.

Nearly a year passed before Tour Travel was notified of a discrepancy between the blank tickets which had been consigned to it and those which Pan American had repossessed. On March 8, 1960, Pan American wrote Tour Travel that an audit of its consigned ticket stock and its ticket sales showed the six tickets redeemed August 6, 1959, had been among those originally consigned to Tour

Travel and had not been accounted for by it. It later developed that the validation stamp on the six redeemed tickets, which purported to be that of Delta Travel Bureau, was not the stamp of Delta, which denied any connection with or knowledge of the validation and sale of the redeemed tickets.

Further investigation seemed to implicate Joanne Coan and Cecilia Karikas, who had worked in the Washington office of Tour Travel, but who had left its employ about the end of April, 1959, Finally, a thirty-count indictment was returned against them in the District of Columbia. The first twelve counts charged them with forging and uttering the six tickets which were redeemed by Pan American. With respect to each of the six refund checks, the women were charged in separate counts with forging the endorsement, uttering the check with the forged endorsement, and causing it to be transported in interstate commerce —a total of eighteen counts in addition to the first twelve.

On March 20, 1961, Joanne Coan entered a plea of guilty to count 16, which charged her and Cecilia Karikas with forging the endorsement "Ling Chen" on the back of the refund check bearing that name as payee. Thereafter she testified for the Government at the trial of Cecilia Karikas. She gave evidence in considerable detail: that she and Miss Karikas were both employed by Tour Travel until some time in the spring of 1959, after which she went to her home in Pennsylvania but returned to Washington to visit Miss Karikas at her apartment; that six blank tickets which she had in her file were filled out on a typewriter in the apartment at the suggestion of Miss Karikas; that, claiming to be Anne Whiteside, she obtained the refund checks and delivered them to Miss Karikas, who endorsed three of them and asked her to endorse the other three so the handwriting would not be the same; that she received from Investment Bankers the check heretofore mentioned and delivered it to Miss Karikas, who later gave her

$2,000 in cash as her part of the ill-gotten proceeds.

It is unnecessary to summarize the remainder of Mrs. Coan's testimony which completed the story of how they carried out the fraudulent scheme. Details were furnished by other witnesses—bankers, F.B.I. agents, a handwriting and typewriting expert, the manager of Tour Travel, and Pan American's employees.

In a preliminary interview with investigating officers, Miss Karikas first denied any connection with or knowledge of the scheme to defraud, but finally admitted and later testified that she had signed the names of the payees on three of the refund checks, although she denied any intent to defraud. She was found not guilty under the first twelve counts, which charged her with forging and uttering the six false tickets, but was found guilty under the remaining eighteen counts, which accused her of forging the endorsements, uttering the checks with the endorsements so forged, and causing them to be transported in interstate commerce.

Miss Karikas advances several reasons for reversal. First she argues the trial court erred in refusing to require a mental examination of Mrs. Coan, "where," she says, "there was evidence that the co-defendant might be a pathological liar." Her pre-trial motion that a mental examination of Mrs. Coan be ordered was based principally on the affidavit of a psychiatrist, who had never seen Mrs. Coan, to the effect that a person with a background such as hers had been represented to him, *might* be a pathological liar. Appellant withdrew the motion but renewed it after Mrs. Coan had testified against her. Because of the additional fact that the witness had admitted making false statements about her accomplishments in the musical world, Miss Karikas said a mental examination should be ordered. Mrs. Coan's attorney, a respected practitioner with thirty years' experience, who had represented her in other matters as well, said he thought her quite normal. In denying the motion, the trial judge said he could not see "the

slightest basis for a mental examination of her * * *. The cross-examination and the facts elicited on cross-examination may very well ultimately go to the value and weight of her testimony before a jury, but there is nothing in it to suggest itself to me at all that a mental examination for her is in order." We hold the judge acted within his discretion in denying the motion.

■ Appellant thus states her second reason for reversal:

"The trial court erred in questioning appellant in a manner which indicated that the court believed appellant was guilty of forgery and doubted her explanation and in permitting Government counsel to characterize appellant's answers to the court as a 'judicial admission' of her guilt of forgery."

Testifying in her own defense, Miss Karikas admitted endorsing three of the refund checks, but said she did so at the request of Mrs. Coan in order to facilitate depositing the checks to the account of the travel agency, and denied any intent to defraud. On cross-examination by Mr. Smithson, Government counsel, and examination by the court, the following occurred:

"Q. [By Mr. Smithson]. Weren't you at all concerned about the forgery of the fictitious names on the back of the checks?

"Mr. Sandground [Attorney for Miss Karikas]: I object, Your Honor.

"The Court: On what ground?

"Mr. Sandground: I don't think that is a proper question. It is a conclusion, forgery, and has certain legal implications.

"The Court: It also has a meaning, I think, for any layman. I overrule the objection. You may answer.

"Weren't you concerned about forging a negotiable check?".

"The Witness: I did not think of forgery, sir.

"The Court: What did you think of it as?

"The Witness: I was just merely accommodating Miss Dinstel [Mrs. Coan] in signing the name of the person on the front to the other side, so that the names would look different, and that she could deposit them in the bank in New York, as she said she would.

"The Court: To whose account?

"The Witness: To Tour Travel."

Appellant's argument is that the judge's use of the word "forgery," which imputes an intent to defraud, indicated to the jury he had already decided appellant had that intent, when in fact the existence of the intent was a question for the jury. But in the court's instructions it was made plain that the jury must find beyond a reasonable doubt an unlawful and fraudulent intent, as well as a false making or signing. In view of the careful instructions, we think the jury must have clearly understood that, in the examination of a witness, the court's occasional use of the word "forgery" to describe a false signing was not intended to foreclose in any way the issue of intention to defraud, which was for them to decide.

■ Government counsel's characterization of appellant's statement that she falsely endorsed three of the checks as "a judicial admission in open court of the forgery" was not strictly accurate, as she did not admit having had an intent to defraud, which is, as we have said, an ingredient of forgery. She admitted only the false signing. But Government counsel, in his comment, added the following: "but she denies that she had any intent to profit by them." While he did not thus say she denied an intent to defraud, we think his additional language sufficiently suggested that idea. So, even if the challenged statement in the argument of Government counsel was technically erroneous, we do not think it was so serious as to require reversal. Moreover, we do not agree that the trial judge questioned appellant "in a manner which indicated the

court believed appellant was guilty of forgery and doubted her explanation." On the contrary, the court's questions gave Miss Karikas an opportunity, which she embraced, to amplify and emphasize her denial of an intent to defraud.

As a third reason for reversal, appellant says:

"The trial court erred in permitting Government counsel to argue to the jury that counsel for appellant had reserved an opening statement to the jury to permit counsel and appellant an opportunity to weave a defense after the close of the Government's case, thus impugning the conduct of counsel and appellant in an improper and prejudicial manner."

It is noted that appellant did not object to the prosecutor's remarks at the time they were made, and did not request the court to instruct the jury to disregard them. Having failed to do so, and the matter not amounting to plain error affecting substantial rights, she cannot complain here that she was prejudiced by what was said by Government counsel. Cf. Rule 30, Federal Rules of Criminal Procedure, 18 U.S.C.A., and Villaroman v. United States, 87 U.S.App.D.C. 240, 184 F.2d 261, 21 A.L.R.2d 1074 (1950).

Moreover, the fact that appellant's trial counsel did not object indicates he did not regard the prosecutor's remarks as a reflection upon him or his client; the first complaint on that score is made here by appellant's counsel on appeal who did not represent her at the trial. Mr. Sandground, trial counsel for Miss Karikas, was within his rights in obtaining permission to withhold his opening statement until the United States had presented its case, as the prosecuting attorney stated to the jury; and doing so was probably a good trial tactic. He could then legitimately frame his defense to meet the evidence adduced by the Government, which was a perfectly proper

course for him to take. The prosecutor's remarks were perhaps too picturesque, but we are sure they were not intended as a charge of wrongdoing against appellant's trial counsel, who is a capable and honorable member of our bar.

Appellant's fourth and final contention is that the trial judge erred in denying her motion for judgment of acquittal because, she says, there was insufficient evidence of intent to defraud. Mrs. Coan's testimony and circumstantial evidence from other witnesses, including Miss Karikas herself,[1] was amply sufficient, we think to justify the jury in rejecting appellant's denial of a fraudulent intent.

As prejudicial error does not appear, the judgment appealed from must be upheld.

Affirmed.

---

1. She said Mrs. Coan endorsed three of the refund checks and she endorsed the other three "so that the names would

look different." From this the jury could infer she knew the checks were being endorsed for a fraudulent purpose.