**William J. GASS, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 21198.**

United States Court of Appeals
District of Columbia Circuit.

Argued March 19, 1968.

Decided Jan. 29, 1969.

768

Mr. Louis P. Robbins, Washington,
D. C., with whom Mr. Solomon Gross-
berg, Washington, D. C. (both appointed
by this court) was on the brief, for ap-
pellant.

Mr. Albert W. Overby, Jr., Asst. U. S.
Atty., with whom Messrs. David G.
Bress, U. S. Atty., and Frank Q. Ne-
beker, Asst. U. S. Atty., were on the
brief for appellee. Mr. John A. Terry,
Asst. U. S. Atty., at the time the record
was filed, also entered an appearance
for appellee.

Before WRIGHT, McGOWAN and
ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III,
Circuit Judge:

A lone gunman entered a dry cleaning
establishment shortly before its 7:00
p. m. closing time on February 3, 1966,
and ordered a female employee to "hand
over the money." The employee showed
him a half-opened cash register drawer
and stated that it contained no money.
The lady manager of the business,[1] the
only other person in the premises, was
summoned from a back room, and she
likewise denied that there was any money
on hand.

1. She was the wife of the proprietor of the establishment, acting in a managerial capacity in
his stead at the time.

Not to be deterred, the gunman escorted the two women into the back room and again told the manager to "get the money," whereupon the day's receipts were turned over to him. Acceding to his further demands, the women handed him a dollar each from their respective purses, which had been placed on a table nearby.

At this point, the gunman produced cord from his pocket, tied the manager's hands behind her back, and secured her in a bathroom. He then raped the employee, confined both women in the bathroom, and left. The captives eventually extricated themselves, and called the police.

About 9:30 that evening, the raped employee was given physical and gynecological examinations at a hospital. The physical examination disclosed no external bruises or evidence of trauma, and so was inconclusive as to recent sexual activity. The gynecological examination, however, was positive on that score; smear tests disclosed intact sperm.

Shortly thereafter, appellant was arrested and identified as the robber-rapist by the employee and the manager.[2] Tried in the District Court on an indictment in one count of rape[3] and two counts of robbery,[4] a jury rejecting his claim of alibi[5] found him guilty on all charges.

On this appeal, appellant attributes error to (1) the admission into evidence of slides containing the smears; (2) his impeachment, after giving testimony in his own behalf, by use of a prior conviction; and (3) certain statements by Government counsel in closing argu-

ment.[6] After careful study of the record in its bearing upon these contentions, we conclude that the conviction should stand affirmed.

I

The examinations of the raped employee were conducted by Dr. Marlene Nelson Kelly at the District of Columbia General Hospital. In the course of the gynecological examination, smears from the vaginal vault and cervix were taken on slides, on each of which Dr. Kelly had scratched the patient's name and her own. The slides were then turned over to a nurse, who took them to the hospital's laboratory for further examination.

On the next morning, Dr. Benjamin Turla, a pathologist, conducted the laboratory examination and, over appellant's objection, testified that one of the slides contained intact sperm taken from the cervix. Subsequent to the laboratory procedures, Dr. Kelly also performed a sperm test, and she was permitted to testify that she found intact sperm in secretions from the vagina. The slides themselves, also objected to, were admitted in evidence.

The crux of appellant's objections was that the Government's evidence failed to identify the slides that were examined as the slides upon which the smears had been placed, and fell short of establishing a chain of continuous custody and control of the slides from the time they were made until they were examined. Appellant relies heavily on Novak v. District of Columbia,[7] where we reversed a conviction of driving an

2. Appellant's trial was completed before the decisions in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). No assault is launched against the identifications on the basis of the principles announced in those cases. Appellant does, however, attack the factual accuracy of those identifications.

3. D.C.Code § 22–2801 (1967 ed.).

4. D.C.Code § 22–2901 (1967 ed.).

5. As is hereinafter discussed more elaborately, appellant claimed that at the time of the offenses he was attending a movie with his girl friend.

6. Appellant also contends that the trial court erred in refusing to direct a judgment of acquittal. We treat this contention infra note 38.

7. 82 U.S.App.D.C. 95, 160 F.2d 588 (1947).

automobile under the influence of intoxicating liquor which had been predicated upon laboratory analyses of the accused's urine revealing a high alcoholic content. A police officer had testified that at the time of the arrest the accused furnished him a urine sample, and that he then put the accused's name and his own initials on the bottle containing the sample and delivered it to the District's Department of Health. At the trial, a laboratory report of the Health Department and testimony of a Health Department chemist established the analyses, and the fact that both of them had been made of urine samples taken from a bottle labeled with the accused's name, but the bottle was never identified or offered in evidence. We held that the report and the testimony were inadmissible. Since it had never been shown that the analyses were made from the urine sample taken from the accused, we held that "[t]here is missing a necessary link in the chain of identification," [8] fatal to the conviction.

Were there no other pertinent considerations, we would conclude that the *Novak* rule was adequately satisfied here. For purposes of his examination, Dr. Turla identified the slides by the markings Dr. Kelly had placed on them, and at the trial both he and Dr. Kelly identified the slides by those markings.

As we have stated, the markings contained the names of the examining physician and the patient, and Dr. Kelly testified that she marked no other slides with those two names. Thus the possibility that other slides may have borne the same combination of names was statistically remote indeed.

▆ Moreover, Dr. Kelly had possession of the slides until she gave them to a nurse to carry to the hospital laboratory, and the slides were kept in the laboratory from then until they were examined. At most unaccounted for was the period when the nurse had them in transit from Dr. Kelly to the laboratory, and we do not think that calling the nurse as a witness was essential to the showing the government was required to make.[9] The normal presumption that individuals entrusted with grave responsibilities discharge them with care [10] "should apply a fortiori to doctors and nurses, whose professional training and traditions teach them to be meticulous." [11] The record is bare of any indication that the nurse mishandled or tampered with the slides. The *Novak* rule demands that the possibilities of misidentification and adulteration be eliminated, not absolutely, but as a matter of reasonable probability,[12] and the evidence complies with that standard here.

8. *Id.* at 96, 160 F.2d at 589.

It is generally recognized that tangible objects become admissible in evidence only when proof of their original acquisition and subsequent custody forges their connection with the accused and the criminal offense. Pinkney v. United States, 124 U.S.App.D.C. 209, 211, 363 F.2d 696, 698 (1966) ; Headen v. United States, 115 U.S.App.D.C. 81, 83, 317 F.2d 145, 147 (1963) ; Peden v. United States, 96 U.S.App.D.C. 27, 29, 223 F.2d 319, 321, cert. denied 359 U.S. 971, 79 S.Ct. 886, 3 L.Ed.2d 838 (1955) ; Smith v. United States, 81 U.S.App.D.C. 296, 157 F.2d 705 (1946). Cases applying this rule almost invariably involve physical evidence taken from the accused for use against him at trial. See the cases cited *supra*.

9. Compare Adams v. United States, 134 A.2d 645, 648–649 (D.C.Mun.App.1957), holding that the testimony of an inspector for the Food and Drug Administration who transported a sealed envelope containing drugs from Washington for delivery in Baltimore was unnecessary since he was only a courier.

10. See International Shoe Co. v. FTC, 280 U.S. 291, 302, 50 S.Ct. 89, 74 L.Ed. 431 (1930) ; Pasadena Research Laboratories v. United States, 169 F.2d 375, 382 (9th Cir.), cert. denied 335 U.S. 853, 69 S.Ct. 83, 93 L.Ed. 401 (1948).

11. Pasadena Research Laboratories v. United States, *supra* note 10, 169 F.2d at 382. See also the cases cited *infra* notes 20–21 and accompanying text.

12. United States v. S. B. Penick & Co., 136 F.2d 413, 415 (2d Cir. 1943) ; West v. United States, 359 F.2d 50, 55 (8th Cir. 1966) ; Barquera v. California, 374 F.2d 177, 180 (9th Cir. 1967).

Subsequent to our *Novak* decision, we pointed out in Wheeler v. United States [13] that evidence introducible under the Federal Business Records Act [14] satisfies *Novak* requirements. The Act provides that "any writing or record * * * made as a memorandum or record of any act, transaction, occurrence or event" becomes admissible as evidence thereof "if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record" contemporaneously with or within a reasonable time after the event recorded.[15] It further specifies that "[a]ll other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may * * * affect its weight, but * * * shall not affect its admissibility." [16]

*Wheeler* parallels in striking fashion the case at bar. There an examination was conducted in a hospital of an alleged rape victim to determine whether there had been an act of intercourse. Smears were placed on slides scratch-marked to identify both the examining physician and the patient, and were transmitted to the hospital's laboratory for testing. At Wheeler's trial, the examining physician and a laboratory bacteriologist so associated the slides by their markings so as to leave "no doubt that these slides were made and kept in the regular course of business and that it was the hospital's regular course of business to make them." [17] We held that the slides, and testimony as to the laboratory findings upon their examination, were properly let into evidence, and that other circumstances went only to the weight to be ascribed to them. We distinguished *Novak* on the ground "that the specimen there was not taken in the business of the laboratory involved. Instead it was taken by an outside agency, the police, and only thereafter delivered to the laboratory." [18]

Appellant seeks, however, to avoid that consequence here by urging that while the evidence establishes that

13. 93 U.S.App.D.C. 159, 211 F.2d 19 (1953), cert. denied 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954).

14. 28 U.S.C. § 1732(a) (1964), quoted *infra* note 15.

15. "In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility." 28 U.S.C. § 1732(a) (1964).

16. *Id.*

17. Wheeler v. United States, *supra* note 13, 93 U.S.App.D.C. at 163, 211 F.2d at 23.

Courts agree unanimously that routine hospital records qualify for admission under the Act. Simms v. United States, 101 U.S.App.D.C. 304, 248 F.2d 626, cert. denied 355 U.S. 875, 78 S.Ct. 127, 2 L.Ed. 2d 79 (1957) ; Wheeler v. United States, *supra* note 13; Ulm v. Moore-McCormack Lines, Inc., 115 F.2d 492 (2d Cir.), cert denied 313 U.S. 567, 61 S.Ct. 941, 85 L.Ed. 1525 (1957) ; Birdsell v. United States, 346 F.2d 775, 779 (5th Cir.), cert. denied 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965). Records of medical diagnosis or opinion are, however, generally excluded. Smith v. United States, 122 U.S.App.D.C. 300, 304–305, 353 F.2d 838, 842–843 (1965) ; cert. denied 384 U.S. 910, 86 S.Ct. 1350, 16 L.Ed.2d 362 (1966) ; Lyles v. United States, 103 U.S. App.D.C. 22, 28, 254 F.2d 725, 731 (*en banc* 1957), cert. denied 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958) ; Polisnik v. United States, 104 U.S.App. D.C. 136, 137, 259 F.2d 951, 952 (1958) ; New York Life Ins. Co. v. Taylor, 79 U.S.App.D.C. 66, 147 F.2d 297 (1945).

18. Wheeler v. United States, *supra* note 13, 93 U.S.App.D.C. at 164, 211 F.2d at 23. And see Clainos v. United States, 82 U.S. App.D.C. 278, 163 F.2d 593 (1947).

the slides were made in the course of the hospital's regular business it does not show that it was the regular course of the hospital's business to make such slides. Appellant is undoubtedly correct in his insistence that each of these conditions is prerequisite to admissibility,[19] but the evidence establishes that both obtained here. As the Supreme Court has said, the essential determination on admissibility is to be made "[according to] the character of the records and their earmarks of reliability * * * acquired from their source and origin and the nature of their compilation."[20] Furthermore,

> There is good reason to treat a hospital record entry as trustworthy. [Footnote omitted]. Human life will often depend on the accuracy of the entry, and it is reasonable to presume that a hospital is staffed with personnel who competently perform their day-to-day tasks. To this extent at least, hospital records are deserving of a presumption of accuracy even more than other types of business entries.[21]

In this case, Dr. Kelly testified that she had made about ten examinations similar to that conducted here during the rather limited period of her connection with the hospital. Dr. Turla answered affirmatively the prosecutor's questions as to whether markings of the examining physician's and patient's names on slides in such cases are "placed there *normally* by hospital personnel in

the ordinary course of hospital business."[22] Moreover, in response to the trial judge's question as to whether there was "an established procedure" when another physician conducts the examination and prepares the slides, he also testified that "as soon as the specimen is received in the laboratory, the specimen itself is checked for identification on the patient, the names of the doctors and we enter that in our books," and that thereafter the laboratory examination is made. While the testimony was not as clear-cut as it could have been, we think that it showed adequately, not only that the slides in question were made and analyzed in the regular course of hospital operations, but also that it was a part of the hospital's regular business to make and analyze such slides. We hold that the slides were properly admitted into evidence and that the weight to be attached to them was a matter for the jury.[23]

## II

Two defense witnesses gave testimony which if believed by the jury would have established that appellant could not have committed the offenses charged. A lady friend said that he was in her company on the date in question from about 5:55 p. m. onward, including the period from approximately 7:15 to nearly 11:00 p. m. in a movie. A male acquaintance stated that he saw appellant in the theater at about 7:35 that evening.[24]

19. See the Supreme Court's edifying construction of the Act in Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943). The Court there concluded that the statutory term "regular course of business" refers essentially to "the inherent nature of the business in question and in the methods systematically employed for the conduct of the business as a business." *Id.* at 115, 63 S.Ct. at 481. Regularity alone was declared to be an improper test of admissibility; the test is the "character of the records and their earmarks of reliability * * * acquired from their source and origin and the nature of their compilation." Thus, admission is extended only to those records that are "reflections of the day to day opera-

tions of a business." *Id.* at 113–114, 63 S.Ct. at 480. See, Note, Criteria for Admissibility Under the Federal Business Records Act. 45 Va.L.Rev. 717, 721 (1959).

20. Palmer v. Hoffman, *supra* note 19, 318 U.S. at 114, 63 S.Ct. at 480 (1943).

21. Thomas v. Hogan, 308 F.2d 355, 361 (4th Cir. 1962).

22. Emphasis supplied.

23. See note 15, *supra.*

24. A third witness also testified, but the earliest she saw appellant was about 11:30 p. m., and she was not positive that it was on the date in question.

After these witnesses had testified, defense counsel advised the court that a decision had to be made as to whether appellant should also testify. Invoking Luck v. United States,[25] he requested a ruling as to whether if appellant did testify the Government would be allowed to impeach him on the basis of prior criminal conviction. It then developed that in 1953 appellant was twice convicted of robbery and given consecutive sentences totaling six to nineteen years, from which he was paroled in 1964. The prosecuting attorney, alluding to the fact that appellant had already presented alibi witnesses, argued that the Government should be permitted to use the convictions for impeachment if appellant decided to add his own testimony to what had gone before. The trial judge ruled that the Government could devote one of the convictions to that purpose, which the Government did when appellant later testified.

So, once again,[26] we are confronted with a contention of error in the treatment of a Luck request, but it is satisfactorily answered by our prior decisions. "Convictions for crime," we have said, "retain statutorily some degree of relevance to trustworthiness which Luck does not automatically dispel."[27] What Luck taught was that Congress "left some room for the play of judicial discretion over the unfolding circumstances of the immediate trial,"[28] and thereby "endowed the trial judge with a new resource of flexibility in conducting the search for truth."[29] The trial judge's function, we have explained, is to weigh the probative contributions that impeachment might make on issues of credibility against the ever-present risk of prejudice to the accused on the issue of guilt,[30] and to exercise discretion according to how the cause of truth would seem to be better served.[31] And that discretionary exercise, we have equally emphasized, is to be "accorded a respect appropriately reflective of the inescapable remoteness of appellate review."[32]

In Gordon v. United States,[33] we announced guidelines to assist trial judges in making Luck determinations. Although the case at bar was tried before Gordon was decided, the trial judge's ruling comports well with Gordon criteria.[34] The conviction used for appellant's impeachment was for robbery, an offense involving stealing—"conduct," we said in Gordon, "which reflects adversely on a man's honesty and integrity."[35] The age of the conviction, about 14 years when appellant testified, presents no problem of remoteness in Gordon terms, for appellant, having been incarcerated until late 1964—15 months

---

25. 121 U.S.App.D.C. 151, 348 F.2d 763 (1965).

26. See the cases collected in the appendix to Weaver v. United States, 133 U.S.App. D.C. 66, 408 F.2d 1269 (Jan. 22, 1969).

27. Brooke v. United States, 128 U.S.App. D.C. 19, 25, 385 F.2d 279, 285 (1967).

28. Hood v. United States, 125 U.S.App. D.C. 16, 18, 365 F.2d 949, 951 (1966).

29. Weaver v. United States, supra note 26, 133 U.S.App.D.C. at 69, 408 F.2d at 1272.

30. Luck v. United States, supra note 25, 121 U.S.App.D.C. at 156–157, 348 F.2d at 768–769; Gordon v. United States, 127 U.S.App.D.C. 343, 346, 383 F.2d 936, 939 (1967), cert. denied 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968); Brooke v. United States, supra note 27, 128 U.S.App.D.C. at 25, 385 F.2d at 285.

31. See the cases cited supra note 30.

32. Luck v. United States, supra note 25, 121 U.S.App.D.C. at 157, 348 F.2d at 769. See also Gordon v. United States, supra note 30, 127 U.S.App.D.C. at 346, 383 F.2d at 939; Brooke v. United States, supra note 27, 128 U.S.App.D.C. at 25, 385 F.2d at 285.

33. Supra note 30.

34. We have been lenient toward pre-Gordon rulings. See Williams v. United States, 129 U.S.App.D.C. 332, 394 F.2d 957, 961–962 cert. denied 390 U.S. 971, 88 S.Ct. 1056, 19 L.Ed.2d 1184 (1968); Payne v. United States, 129 U.S.App. D.C. 215, 392 F.2d 820, 821 (1968).

35. 127 U.S.App.D.C. at 347, 383 F.2d at 940.

before the instant crimes—could hardly be said to have led the "legally blameless life"[36] which might dissipate the relevance of a past conviction. And although the impeachment here was by a conviction of robbery, the offense charged in two of the counts on which appellant was being tried, the trial judge, by limiting the impeachment to but one of the two prior robbery convictions, exercised a discretion in harmony with a suggestion that *Gordon* was later to make. That suggestion was "to limit the impeachment by way of a similar crime to a single conviction and then only when the circumstances indicate strong reasons for disclosure, and where the conviction directly relates to veracity."[37]

■ The *Gordon* criteria are, as we have indicated, just guidelines, and not unbending rules inexorably determinative of the problem as to whether and to what extent impeachment should be permitted. Judicial discretion, in an endeavor to enable the jury to get at the truth, is the soul of any satisfactory resolution. Here the critical inquiry was on credibility, as between the Government's two identification witnesses and appellant's two alibi witnesses[38]—a situation wherein "there was a greater, not less, compelling reason for exploring all avenues which would shed light on which of the * * * witnesses was to be believed."[39] It was quite evident, when the *Luck* request was advanced, that appellant's testimony would be calculated to support the alibi already related by his witnesses,[40] and as events turned out his own testimony did not add any significant details to those the jury had already been given. All circumstances considered, we think the trial judge was at liberty to determine that "with credibility so vital, the cause of truth was not likely to be advanced by permitting appellant to testify to events already delineated to the jury if facts germane to the reliability of that testimony were suppressed."[41]

### III

■ Finally, appellant contends that certain remarks by Government counsel addressed to the jury during his summation were improper and prejudicial. We have examined the challenged statements and find that none warrants upsetting appellant's conviction, and that only one requires extended comment.[42]

36. *Id.* at 347, 383 F.2d at 940.

37. *Id.* at 347, 383 F.2d at 940.

38. As we have observed, *supra* note 6, appellant urges that, in view of his showing on alibi, the evidence was legally insufficient to support the conviction. One of the alibi witnesses was appellant's girl friend, the other apparently a friend, and their association of the movie episode with the offense date was not airtight. Appellant's third witness did not see him until long after the offenses had been completed, and appellant's own alibi testimony was impeached. We cannot say that there was "no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt." Curley v. United States, 81 U.S.App.D.C. 389, 392–393, 160 F.2d 229, 232–233, cert. denied 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

39. Gordon v. United States, *supra* note 30, 127 U.S.App.D.C. at 348, 383 F.2d at 941.

40. That was the natural assumption, particularly since, when the *Luck* request was presented, it was unaccompanied by advice to the trial court as to the nature of appellant's forthcoming testimony. Compare the suggestion in Gordon v. United States, *supra* note 30, 127 U.S. App.D.C. at 346, 383 F.2d at 939, and Weaver v. United States, *supra* note 26, 133 U.S.App.D.C. at 68 n. 1, 408 F.2d at 1271, relative to a nonjury hearing of the accused's testimony for evaluation for *Luck* purposes prior to his taking the witness stand.

41. Brooke v. United States, *supra* note 25, 128 U.S.App.D.C. at 25, 385 F.2d at 285.

42. The record does not sustain the claim that Government counsel mischaracterized the testimony of a police officer or unduly stressed appellant's prior robbery conviction.

Several times Government counsel prefaced his remarks to the jury with the omniscient phrase "we know." Taken in full context, however, it conveys the idea of a summary of evidentiary items and not the impression that counsel was interjecting matters of personal knowledge. Nonetheless, because of its propensity for

When appellant took the witness stand in his own behalf, he recited from a prepared list the names of eight persons, other than those who had already testified, who allegedly saw him at the theater on the evening in question. Yet, although these eight individuals allegedly possessed information crucial to appellant's cause, none was called to verify his alibi. The prosecuting attorney, in summation, argued that from this failure an inference might reasonably be drawn that their testimony would not have favored the alibi. No instruction in this regard was incorporated into the court's charge to the jury.

■ An adverse inference is permitted from the failure of the accused to call witnesses "peculiarly within [his] power to produce" when their "testimony would elucidate the transaction."[43] Here the record indicates that both the claimed existence of the eight witnesses and their identity remained undisclosed until appellant testified late in the trial. Thus they were distinctively defense witnesses in the sense that the Government was unaware of them and, if indeed witnesses to the alibi, their testimony would have enlightened the jury considerably. But their availability as witnesses at the trial was not explored, and the record leaves this aspect of the matter unclear. We do not know whether, as to any or all of the eight missing witnesses, appellant knew their whereabouts or whether they were otherwise amenable to subpoena.[44]

■ The prosecutor's comment was obviously improper with respect to any of the eight witnesses whom appellant might have been powerless to produce at the trial.[45] But the comment was not objected to, and ordinarily we do not entertain challenges to the propriety of argument to the jury that are first raised on appeal.[46] The wisdom of that practice becomes evident in this case, since if objection had been made appellant's ability to procure the witnesses might then have been explored. We note also that appellant never gave so much as a hint as to why none of the eight witnesses was produced. We think the mathematical probabilities are that all eight of the witnesses would hardly have been unproducible, with the very likely result that the prosecutor's comment was at least partly if not substantially accurate. In these circumstances, we do not find plain error.

■ We think, however, that for the future when counsel, either for the prosecution or the defense, intends to argue to the jury for an inference to be derived from the absence of a witness, an advance ruling from the trial court should be sought and obtained.[47] We think, too, that if such argument is to

misleading in different circumstances, the phrase should be avoided.

43. Wynn v. United States, 130 U.S.App. D.C. 60, 397 F.2d 621, 625 (1967). See also Pennewell v. United States, 122 U.S. App.D.C. 332, 333, 353 F.2d 870, 871 (1965); Richards v. United States, 107 U.S.App.D.C. 197, 200, 275 F.2d 655, 658, cert. denied 363 U.S. 815, 80 S.Ct. 1253, 4 L.Ed.2d 1155 (1960); Billeci v. United States, 87 U.S.App.D.C. 274, 278–279, 184 F.2d 394, 398–399, 24 A.L.R.2d 881 (1950).

44. Compare Wynn v. United States, *supra* note 43, 130 U.S.App.D.C. at 64–65 n. 23, 397 F.2d at 625 n. 23.

45. See the cases cited *supra* note 43.

46. Karikas v. United States, 111 U.S. App.D.C. 312, 316, 296 F.2d 434, 438

(1961). See also Accardo v. United States, 102 U.S.App.D.C. 4, 5, 249 F.2d 519, 520 (1957).

"[C]ounsel for the defense cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 238–239 60 S.Ct. 811, 851, 84 L.Ed. 1129 (1940).

47. Compare our similar suggestion in Wynn v. United States, *supra* note 43, 130 U.S.App.D.C. at 64–65, 397 F.2d at 625–626. This case, however, was tried before *Wynn* was decided.

be permitted, an appropriate instruction should be given defining for the jury the conditions under which the inference might be properly drawn. Only by such a practice can the risk of vitiating the entire trial by improper argument be avoided, and can the jury be informed sufficiently to enable it to intelligently discharge its function in that regard.

Affirmed.