**Timothy L. WASHINGTON, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**No. 13690.**

District of Columbia Court of Appeals.

Submitted May 9, 1979.

Decided July 23, 1979.

Peter V. Train, Arlington, Va., appointed by this court, was on the brief for appellant.

Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry, Michael W. Farrell, Timothy J. Reardon, and William J. Hardy, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

Before KERN and GALLAGHER, Associate Judges, and PAIR, Associate Judge, Retired.

PAIR, Associate Judge, Retired:

On this appeal from convictions of rape,[1] assault with intent to commit sodomy,[2] and robbery,[3] the only claim of error is the trial court's missing witness instruction and the related remarks of the prosecutor in his summation to the jury. Because in our view of the trial proceedings the error, if any, was harmless, we affirm.

On January 5, 1977, at approximately 8:15 p. m., the victim of the crimes (complainant) was confronted by three young men as she ascended the stairs to her apartment. She referred to the men as numbers 1, 2, and 3, according to their respective levels of participation. Number 1, com-

---

**1.** D.C.Code 1973, § 22–2801.

**2.** D.C.Code 1973, § 22–3502.

**3.** D.C.Code 1973, § 22–2901.

plaintant stated, was the dominant figure, the "person who was doing most of the talking and was the one who was in front of me and threatening me the most and at some point telling the other two what to do." Appellant was later identified by complainant in a lineup and at trial as number 1. The other participants, referred to as numbers 2 and 3, testified for the government[4] and identified appellant as a participant with them in the crimes. The testimony of numbers 2 and 3 and that of complainant was strikingly corroborative each of the other even in minor details.

The substance of the testimony was that appellant initiated the assault by grabbing the complainant from behind and placing his arm around her throat. She cried out for help, causing more than one of her assailants to strike her about the head and to tell her to remain quiet. Her purse was taken from her and searched, and a twenty-dollar bill was removed.[5] Complainant was then forced to accompany her assailants to the top of the stairwell. Once there, appellant took a wristwatch from her. Her raincoat was removed, and the pockets of the coat were searched. Her skirt was then unbuttoned, her underwear was pulled down, and appellant and number 2 placed her on the floor, while number 3 acted as a lookout. At this time, number 2 either attempted or momentarily completed the act of anal sodomy. Complainant was then rolled over onto her back and raped, first by appellant, then by number 2. Number 3 was asked whether he would participate in the sexual assault, but he declined. The three assailants then ran away leaving complainant on the floor at the top of the stairs. After complainant was left alone she went immediately to her apartment and the police, having been notified, arrived shortly thereafter.

Four suspects were soon apprehended and complainant identified two of them as numbers 2 and 3. One of the other two suspects wore clothes which looked familiar, but complainant was unable to identify him as her third assailant because he "just did not look like the same person who I [she] had described . . . as number 1."

Appellant was first connected with the crimes some six months after their occurrence, when in July 1977 he was identified by the complainant at a lineup. She also recognized in that lineup, the individual who had been presented to her on the night of the crimes, the one who had worn the familiar looking clothes, but whom she had been unable to identify as one of her assailants. That person was later identified as appellant's brother.

Numbers 2 and 3 also viewed the lineup. Their testimony was that they had known appellant and his brother for some five years and recognized both of them in the lineup; however, it was appellant whom they identified as their partner in the crimes, and not the brother.

Appellant presented the defense of alibi. In this connection he testified that on January 5, 1977, he left his home and went to the home of a friend, James Cox, arriving at about 7:00 p.m. James Cox was not there at that time, but his mother, Dolores Cox, was, and she admitted appellant. He waited at the Cox home until approximately 9:00 p. m., when James returned. The two then left, got something to eat, and went to Potomac Gardens, where they played basketball until about midnight.

Regarding the game, appellant described it as "full court" basketball, that he had played forward, and that James Cox had played guard. He testified further that he was not friendly with the other three players on his team or with any members of the opposing team, although he was familiar with some of their faces, having seen them before at Potomac Gardens. The only names he was able to supply for the three players were the nicknames: Gushie, Herk, and Francis. Appellant stated that he had not talked about his case with any of such persons.

---

4. Numbers 2 and 3 were tried as juveniles and convicted prior to appellant's trial. They will be referred to infra as numbers 2 and 3.

5. The purse was identified at trial both by complainant and number 2.

James Cox testified in appellant's behalf that he and appellant played basketball at Potomac Gardens on the night in question. However, his testimony varied significantly from appellant's in many other details. According to Cox, he and appellant stayed home from school on January 5, and spent the morning in the Cox home. Between 3:00 and 4:00 p. m., they went to visit friends and remained with them for about three hours. Cox and appellant then went to Potomac Gardens, where they played basketball until approximately midnight.

More variation between the testimony of James Cox and that of appellant appeared in reference to the basketball game. Cox did not describe a full-court game. Rather, when asked on cross-examination whether he had played guard and appellant had played forward, Cox testified:

A: No, we wasn't playing like that.

Q: How were you playing?

A: We was only playing a three man team. We just passing the ball to the other and shoot.

Cox testified finally that two of the players on the opposing team were his brothers, Robert and Stanley. He did not know the names of the other two players. James Cox was the only alibi witness. Neither Dolores Cox, Robert Cox, Stanley Cox, "Gushie", "Herk", nor "Francis" was called to corroborate appellant's testimony or that of James Cox.

At the close of the evidence, the prosecutor, having first obtained a ruling from the trial judge,[6] made, during his summation to the jury and over defense objection, the following comments:

[Appellant] gets on the stand and tells you he came home from school that day and he comes over to the house to wait for Cox and Cox wasn't around, just his mother, and Cox came back and they went out to get something. They didn't quite get it down right, did they? Going to play basketball, five-man basketball, can't remember—Cox gets up there and

tells you it's three man basketball with his brother. *Well, where are these brothers that played ball, where is the mother, where are these alibi witnesses?* (Emphasis added.)

The court then at the request of the prosecutor, and over defense objection, instructed the jury that:

If a witness could have given material testimony on an issue in this case, was peculiarly within the power of one party to produce, and was not called by that party, and his or her absence has not been sufficiently accounted for or explained, then you may, if you deem it appropriate, infer that the testimony of the witness would have been unfavorable to the party which failed to call him or her.

However, no such inference should be drawn by you with regard to a witness who was equally within the power of either party to produce, or whose testimony could have been merely cumulative or immaterial.

It is well settled now that if a party has it peculiarly within his power to produce a witness whose testimony could elucidate the transaction in controversy and fails to do so, an inference is permitted that the testimony of such witness would have been unfavorable to the party who failed to produce him. *Graves v. United States*, 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1893); *Givens v. United States, supra* at note 6; *Hale v. United States*, D.C.App., 361 A.2d 212, 216–17 (1976).

The threshold questions as to the peculiar availability of a witness and his capacity to elucidate are factual and therefore committed to the sound discretion of the trial judge. *Shelton v. United States*, D.C.App., 388 A.2d 859, 863–64 (1978).

We are unable to find abuse of that discretion in either permitting comment by the prosecutor in regard to missing witnesses or in giving the missing witness instruction. Evidence of appellant's participation in the

---

6. *Givens v. United States*, D.C.App., 385 A.2d 24, 27 (1978); *Gass v. United States*, 135 U.S. App.D.C. 11, 19, 416 F.2d 767, 775 (1969).

robbery, rape, and assault with intent to commit sodomy was overwhelming. Crucial, therefore, to the alibi defense was overriding evidence that appellant was, during the time involved, at some other place with some other person.[7] Appellant had it peculiarly within his power to produce witnesses to support his alibi. Certainly it cannot be said that such witnesses were equally available to the government since their identities were not even known until James Cox testified as to the opposing players in the basketball game. *See* in this connection *and compare Hale v. United States*, D.C.App., 361 A.2d 212, 216 (1976); *United States v. Young*, 150 U.S.App.D.C. 98, 106, 463 F.2d 934, 942 (1969). As the court made clear in *United States v. Stevenson*, 138 U.S.App.D.C. 10, 13–14, 424 F.2d 923, 926–27 (1970):

> [I]t is the responsibility of defense counsel to know the identity of possible witnesses who may be useful to a defendant's case and to make reasonable efforts, with Government assistance if necessary to locate and subpoena them. Criminal trials remain a search for truth, but to allow a defendant to identify from the witness stand for the first time the name of a possible witness, and thereafter to penalize the Government for its failure to produce that witness, is, even in this era of resolving all procedural and evidentiary problems against the Government, basically repugnant to the necessary principle that a trial must be fair to both the defendant and the Government.

The Government concedes that it did not demand, pursuant to Super.Ct.Cr.R. 12.1, notice of alibi. But even if we assume on the authority of our recent decision in *Coombs v. United States*, D.C.App., 399 A.2d 1313 (1979), that under the circumstances it was error to permit the comment respecting missing witnesses and to give the challenged instruction, the error was harmless beyond any reasonable doubt. *See Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), where it was said reversal is required only ". . . if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error . . . ."

Applying this standard to the present case, we note again that evidence of appellant's guilt was overwhelming. Finding no error affecting substantial rights, we conclude from all of the foregoing, that the judgments of conviction should be affirmed.

*Affirmed.*

---

7. *Shelton v. United States, supra* at 861.