Edwin R. BUTLER, Appellant,

v.

UNITED STATES, Appellee.

No. 91–CF–1267.

District of Columbia Court of Appeals.

Argued Nov. 12, 1993.

Decided Nov. 7, 1994.

Sheila Thurmond Mayers, for appellant.

Cynthia D. Walicki, Asst. U.S. Atty., with whom J. Ramsey Johnson, U.S. Atty. at the time the brief was filed, John R. Fisher, Elizabeth Trosman, and Robert A. Feitel, Asst. U.S. Attys., were on the brief, for appellee.

Before STEADMAN and SULLIVAN, Associate Judges, and PRYOR, Senior Judge.

SULLIVAN, Associate Judge:

After a joint trial with co-defendant Rodney Bush,[1] appellant was convicted of robbery in violation of D.C.Code § 22–2901 (1989); first-degree burglary in violation of D.C.Code §§ 22–1801(a), –3202 (1989); first-degree theft in violation of D.C.Code §§ 22–3811, –3812(a) (1989); and destruction of property in violation of D.C.Code § 22–403 (1989).

Although appellant challenges his convictions on a number of grounds, we need only address one of the issues raised by him on appeal. Appellant argues that the trial court erred by admitting into evidence, without

1. Bush was acquitted of all charges.

proper authentication, a tape recording of an alleged conversation between appellant and Bush. We agree and, accordingly, reverse his convictions and remand the case for a new trial.

## I.

On November 25, 1990, Timothy Vanover's residence was burglarized and numerous items of personal property, including a ruby ring, were stolen by two men who were subsequently identified by Vanover as appellant and Bush. According to the government's evidence, the ransacking and robbery events consumed some twenty-five to thirty minutes in Vanover's presence, during which the intruders talked to one another and Bush threatened Vanover's life.

On the morning of trial, but prior to jury selection, Bush's attorney informed the trial court that he was in possession of a tape recording which he stated Bush had made. The attorney also represented that the tape, which neither he nor the government's attorney had heard up to that point, consisted of three telephone calls, allegedly made between appellant and Bush, which were approximately thirty minutes in duration. After the tape was played in the courtroom in the presence of appellant, Bush, and their attorneys, the trial court ruled that it did not provide a basis for severance of the trials. Bush's counsel then stated that he wanted to introduce into evidence a portion of the tape during which the voice identified as that of Bush read a police report form # 251 to the voice identified as that of appellant, who made potentially inculpatory statements about selling the ruby ring taken from Vanover's residence. For purposes of this appeal, the portion of the tape recorded conversation between the voices alleged to be those of Bush and appellant is *verbatim* as follows:

BUSH: ah ... Edwin.

BUTLER: Yeah, I'm listening

BUSH: Oh, okay, went down to the police and got both of them jones? I wanted to see what the description said right.

BUTLER: Aha

BUSH: Okay, I'm gonna read to you what it said. Okay the description of the two uhm people is they got suspect 1: black male, thirty years old, 5 foot 5, and heavy. Everything else, they got unknown. And for suspect 2 it says a black male, thirty, 5 foot 10, weight, eyes, hair and all that is unknown. Said he had on a red cap, navy blue coat and jacket and pants unknown. Uhm ... They said in the report,' while at home .. Uhm ... Subject 1 ... suspect 1 and suspect 2 entered his home by throwing a cinder block through the back basement glass door. Suspect 1 then placed a knife to uhm complainant 1's body and stated, 'give me your money or I will kill you.' Complainant 1 handed the currency to suspect 1.. Suspect 1 led complainant 1 by knife point upstairs where the above list of items were taken. Suspect 1 and suspect 2 fled the house through the rear basement door running in an unknown direction. Complaintant [sic] 1 recieved [sic] no injuries. A general broadcast was given at 20:15 hours.

BUTLER: They ain't got nothing. I'm 5'8. I'm the tallest.

BUSH: Eyes- brown, ha.

BUTLER: They said husky build. Neither one of us was husky. You ain't even husky. So I

BUSH: Not really, for real.. Uhm ... That shit in ... And they say ... what they say was taken? They say 20 dollars, ⅜ diamond ring worth 600 dollars, one ¼ diamond ring worth 300 dollars, one ruby ring worth 4000 dollars and one gold worth ...

BUTLER: Woe ... wait a minute. The ruby ring was worth that much?

BUSH: Huh! That's what it said. They say one gold band worth 350 dollars.

BUTLER: Guess how much I sold that ruby for?

BUSH: Huh?

BUTLER: Guess how much I sold that ruby for?

BUSH: How much?

BUTLER: 100 dollars

BUSH: They got it here. They said it was nineteen ... the ruby ring was nineteen years old worth 4000 dollars.

BUTLER: 4000 dollars, Uhm.

BUSH: You got ...

BUTLER: I'm so glad I got rid of it cause I wanted it.

BUSH: Right

BUTLER: Cause I wanted ... I wanted that, man. It was ah ... It was a flawless ruby.

BUSH: Right

BUTLER: It was like a square jewel to em. The thing was flawless.

BUSH: Yeah, flawless, huh. Like it was new, huh.

BUTLER: As far as my eye can see. I ain't no (inaudible) right. Man, you know how rubies kinda a jive burgandy [sic], right.

BUSH: ahuh

BUTLER: and in the light you know it kind of sparkles, right.

BUSH: Right. Haha ... Look kind of fake huh.

BUTLER: Yeah man especially on (inaudible).

BUSH: Right

BUTLER: I say nah. But I had to get rid of that right. That was too ... what's the word ... Ahh

BUSH: Yeah, what's huh. 'Obvious' huh. Too obvious huh.

BUTLER: Yeah

The trial court inquired why Bush wanted to introduce the tape, stating that the tape did not appear to exculpate Bush, but rather made both Bush and appellant sound guilty. Whereupon, the government's attorney announced his desire to introduce the tape into the government's case-in-chief and argued that the government could authenticate the tape by virtue of the contents on the tape and also by a witness who was familiar with the voices on the tape. Over objections by appellant and Bush to the use of the tape by the government, on the grounds that the government could not authenticate the tape by clear and convincing evidence, the trial court stated that it was convinced that the tape was a conversation between appellant and Bush because of the flowing nature of the conversation and the lack of any incentive by Bush to alter the tape. Thus, the trial court ruled that the tape would be admissible at trial, assuming the government could produce a witness to identify the voices on the tape as those of appellant and Bush.

## II.

At trial, the government offered the testimony of Vanover and Detective Revolton Coley to establish a foundation for the admissibility of the tape. Vanover testified that because he had heard Bush's voice throughout the course of the robbery, over a period of twenty-five to thirty minutes, he was able to recognize Bush's voice on the tape (eight months later); Vanover also made in-court identifications of both defendants. Detective Coley testified that as a result of two fifteen-minute conversations with appellant and one forty-five-minute conversation with Bush, he was able to identify the voices on the tape as those of appellant and Bush. The detective also testified that Vanover had previously identified Bush and appellant in photograph arrays. The trial court admitted the tape into evidence, and the jury was supplied with a transcript of the tape to read as the tape was played in open court.

Bush offered two alibi witnesses who testified that he was elsewhere at the time of the burglary of Vanover's residence, and appellant offered a Metropolitan police officer who testified regarding the physical descriptions Vanover had provided to investigating police officers on the evening of the criminal events at his home.

## III.

■ "The admission of tape recordings at trial is a matter committed to the sound discretion of the trial court." *Springer v. United States,* 388 A.2d 846, 852 (D.C.1978). A party seeking admission of tape-recorded evidence, However, must ensure that the tape in question is what its proponent claims, *i.e.,* either the original recording, *see Gass v. United States,* 135 U.S.App.D.C. 11, 14 n. 8, 416 F.2d 767, 770 n. 8 (1969), or an authenti-

cated copy. *See United States v. Knohl*, 379 F.2d 427, 440 (2d Cir.), *cert. denied*, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967); *see also United States v. Shabazz*, 724 F.2d 1536, 1539–40 (11th Cir.1984).

■ Because recorded evidence, which may be susceptible to adulteration, is likely to have a strong impression upon a jury, *see United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991), we have required that, in seeking to introduce tape-recorded conversations into evidence, the government bears the burden of showing, by clear and convincing evidence, that the proffered tapes are "authentic, accurate, and trustworthy." *Springer, supra*, 388 A.2d at 852; *see also Beard v. United States*, 535 A.2d 1373, 1382 (D.C.1988) and *German v. United States*, 525 A.2d 596, 608 (D.C.1987) (wherein this court reiterated the clear and convincing evidentiary standard to be applied by trial courts in this jurisdiction when ruling on issues of admissibility *vel non* of tape-recorded conversations).[2]

■ To establish the authenticity, accuracy and trustworthiness of the tape, we have also required that " 'the possibilities of misidentification and adulteration be eliminated, not absolutely, but as a matter of reasonable probability.' " *Springer, supra*, 388 A.2d at 852 (quoting *United States v. Haldeman*, 181 U.S.App.D.C. 254, 330, 559 F.2d 31, 107, *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1976)). There must be a showing that there are no alterations in the original recording in the form of changes, additions, or deletions because "[m]ore so than photographs or other demonstrative evidence, sound recordings are susceptible to alterations that may be impossible to detect." *United States v. Biggins*, 551 F.2d 64, 66 (5th Cir.1977).

■ Absent evidence of intermeddling or evil motive, a presumption against adulteration or tampering arises when government officials have procured and retained custody of tape recordings. *Ford v. United States*,

396 A.2d 191, 194 (D.C.1978). *See also Tompkins v. United States*, 272 A.2d 100, 102–03 (D.C.1970); *Haldeman, supra*, 181 U.S.App.D.C. at 330–31, 559 F.2d 31 at 108–09. "Typically, the defendants must rebut this presumption by making 'a minimal showing of ill will, bad faith, other evil motivation, or some evidence of tampering.' " *German, supra*, 525 A.2d at 610. Assurances of accuracy, authenticity and trustworthiness are of particular significance where, as here, a tape recording is produced in court on the day of trial by the attorney for a non-testifying codefendant, who presumably possesses exclusive knowledge of the events surrounding the creation of the tape recording, but neither the attorney nor the codefendant is available to testify as to the circumstances surrounding the creation of the tape. Moreover, the tape-recorded conversation was originally offered by Bush's trial attorney in an apparent effort to inculpate appellant. Under those circumstances, no such presumption against adulteration applies.

■ Applying these principles of law to the present case, we hold that the trial court abused its discretion in admitting into evidence the subject tape recording. Where there is sufficient independent indicia of reliability, we are reluctant to disturb the trial court's ruling. *See Shabazz, supra*, 724 F.2d at 1540; *United States v. Hughes*, 658 F.2d 317, 323 (5th Cir.1981), *cert. denied*, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *United States v. Gorel*, 622 F.2d 100, 105 (5th Cir.1979), *cert. denied*, 445 U.S. 943, 100 S.Ct. 1340, 63 L.Ed.2d 777 (1980). Here, however, a foundation for admission of the tape was not "established by the testimony of a participant or someone who heard a simultaneous transmission thereof to the effect that 'the conversation had been fairly reproduced.' " *People v. Rodriguez*, 78 A.D.2d 769, 433 N.Y.S.2d 650, 651 (N.Y.1980), *cert. denied*, 469 U.S. 818, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984).

Detective Coley testified that the redacted

---

2. *Beard* and *German* are, likewise, binding on this court. *M.A.P. v. Ryan*, 285 A.2d 310, 312

(D.C.1971) (no division of this court will overrule a prior decision of this court).

tape[3] was a true duplication of the tape originally proffered by Bush but ultimately offered into evidence by the government. Other than the lay witness identifications of the voices on the redacted tape, however, and Coley's identification of the redacted tape, the government failed to offer any independent evidence whatsoever of either the accuracy of the tape offered by Bush's trial counsel, the manner in which that tape recording was made or whether the tape was indeed the *original* tape or an authenticated copy of the tape. In this regard, there was no testimony from any participant or eavesdropper that the tape accurately and fairly represented and reproduced a telephone conversation in which appellant and Bush participated. It is abundantly clear that relevant information as to the accuracy, authenticity and trustworthiness of the tape recording in the present case remained within the exclusive province of persons not testifying in this case. Accordingly, since we have no evidence as to whether the tape offered by Bush's counsel was the original or a doctored recording, the accuracy of the tape cannot be determined by the requisite standard of clear and convincing evidence.

 We also conclude that a proper foundation for introduction of the tape-recorded evidence was not established due to the failure of the government to offer any evidence to demonstrate the identity and competency of the operator and the fidelity of the recording equipment. *See United States v. Faurote,* 749 F.2d 40, 44 (7th Cir. 1984); *Hughes, supra,* 658 F.2d at 322; *see also Biggins, supra,* 551 F.2d at 66; *see generally* Fed.R.Evid. 901(b)(5). In addition,

when evidence—such as tape recordings—is subject to mishandling or alteration, the chain of custody of the object should also be established. *Gass, supra,* 135 U.S.App.D.C. at 14 n. 8, 416 F.2d at 770 n. 8; *see Hughes, supra,* 658 F.2d at 323. The chain of custody requirement ensures that both the original acquisition and subsequent custody of the tape link it to the accused or the offense. *Gass, supra,* 135 U.S.App.D.C. at 14 n. 8, 416 F.2d at 770 n. 8. Again, no evidence was offered in the present case by the government, or anyone else, regarding the chain of custody of the tape recording.

 In allowing the tape to be admitted into the record, notwithstanding the mysterious sources of the tape, the trial court placed great reliance on the "flowing nature of the conversation, the contents of the tape, and the lack of incentive on the part of Bush to alter the tape." In our view, the trial court's determination that the tape was, in effect, internally self-authenticating by "clear and convincing" evidence is not sustainable on this record. Although the voice identifications were not insufficient in themselves, they were relatively weak.[4] See part II, *supra.*

Furthermore, the trial counsel for Bush, who was proceeding with an alibi defense on behalf of Bush, originally intended to offer into evidence the portion of the tape recording that pertained to appellant allegedly discussing the "ruby ring." Thus, Bush's counsel apparently believed that this portion of the tape recording would either assist Bush's defense or inculpate appellant and not Bush. For that reason and the following, the possi-

---

3. The tape was redacted because the government sought only to introduce a portion of one of the three telephone calls.

4. Appellant also challenges Detective Coley's ability to identify the voices based on his two fifteen-minute interviews with the appellant. Laying a proper foundation for admission of a sound recording requires identification of the speakers. *United States v. Branch,* 970 F.2d 1368, 1372 (4th Cir.1992); *United States v. Cooper,* 868 F.2d 1505, 1519 (6th Cir.), *cert. denied,* 490 U.S. 1094, 109 S.Ct. 2440, 104 L.Ed.2d 996 (1989); *United States v. McCowan,* 706 F.2d 863, 865 (8th Cir.1983); *Biggins, supra,* 551 F.2d at 66. One who first hears a person's voice in a face-to-face conversation *may* later identify it as

the one heard over the telephone or in a recording. *See* Fed.R.Evid. 901(b)(5); *see also United States v. Watson,* 594 F.2d 1330, 1335 (10th Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979); *United States v. Bonanno,* 487 F.2d 654, 659 (2d Cir.1973); *United States v. Whitaker,* 372 F.Supp. 154, 165 (M.D.Pa.), *aff'd,* 503 F.2d 1400 (3d Cir.1974), *cert. denied,* 419 U.S. 1113, 95 S.Ct. 789, 42 L.Ed.2d 810 (1975). Accordingly, although Detective Coley lacked familiarity with the telephone speaking voices of appellant and Bush, he nonetheless spoke to both in face-to-face interviews and therefore was qualified to offer testimony in an effort to establish the identity of their voices on a sound recording.

bility of—indeed the incentive for—alteration of the tape recording was not foreclosed. Specifically, two statements in the tape recording reflect certain minor inconsistencies which could merely be natural parts of the conversation or rather could be the result of alterations to the tape. For example, although the police report as allegedly read by Bush said that one suspect was "heavy," Butler comments on the fact that neither of them is "husky," to which Bush responds, "not really, for real...." In the second statement, Bush's reading of the police report indicates that the eye color of the suspects is unknown; later in the tape, Bush says "eyes-brown, ha." The trial court did not address these apparent inconsistencies.

## IV.

For the foregoing reasons, and in view of the undisclosed circumstances surrounding the making, custody and preservation of the tape proffered by Bush's counsel, coupled with the uncertainties with purely internal authentication, we are not persuaded that the government bore its burden imposed by binding precedent to show, by clear and convincing evidence, that the proffered tape was authentic, accurate, and trustworthy. Accordingly, we hold that the trial court abused its discretion by admitting the tape recording into evidence and that the error was not harmless under the circumstances. We reverse appellant's convictions and remand the case to the trial court for a new trial.

*So Ordered.*