No. 00-102

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 255

STATE OF MONTANA,

            Plaintiff and Respondent,

    v.

DONALD DuBRAY,

            Defendant and Appellant.


APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade, Cause No. CDC-98-019,
The Honorable Kenneth R. Neill, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            Lawrence A. LaFountain, Attorney at Law, Great Falls, Montana

        For Respondent:

            Hon. Mike McGrath, Attorney General; Tammy K. Plubell,
Assistant Attorney General, Helena, Montana

            Brant Light, Cascade County Attorney, Great Falls, Montana


               Submitted on Briefs:  October 31, 2002

                       Decided:  September 23, 2003

Filed:

_____
               Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 Donald DuBray was convicted by a jury of deliberate homicide, theft, and robbery, all relating to an incident which occurred at a Great Falls convenience store in the early morning hours of October 7, 1986. He appeals his conviction. We affirm.

BACKGROUND

¶2 On the night of October 6, 1986, Suzette Pritchard was working at a Town Pump convenience store located on 10th Avenue South in Great Falls. Friends of Suzette's, including Becky Hill, Vicki Kuhn, and Suzette's sister, Annette Pritchard, visited Suzette at work periodically throughout her shift that night. At about 12:55 a.m., Annette, Becky, and Vicki left to get Suzette french fries from a nearby Burger King. When they returned about five minutes later, they noticed a maroon-colored car parked behind the Town Pump that they had not seen before. The three generally described the car as older, beat-up, and dirty.

¶3 Vicki took the french fries into the Town Pump while Annette and Becky waited in the car. Vicki noticed a man she did not recognize at the microwave. The man walked toward her and stopped about three feet in front of her. Vicki observed that he may have been intoxicated. She reported that the man made her feel uneasy, and that she attempted to make conversation with him. Becky and Annette also saw the man, and all three were able to give similar, though not identical, descriptions of him.

¶4 When Vicki returned to the car, she told Annette and Becky that the man gave her the creeps. Becky had the feeling he was just waiting for them to leave. Annette decided she would call her sister intermittently through the rest of her shift that night. As they drove away from the Town Pump, Annette noticed it was 1:08 a.m.

2

¶5 At about 1:20 a.m., Larry Blanchard, the owner of a private security business, drove in front of the Town Pump. He observed a dirty, red, mid-sized car with some body damage leaving from the rear of the store.

¶6 After Vicki dropped her friends off, she and her boyfriend returned to the Town Pump to visit with Suzette. Vicki found Suzette's body lying on the floor behind the counter. At 1:22 a.m., Officer Porter from the Great Falls Police Department was dispatched to the Town Pump. Suzette was dead when he arrived. She had been stabbed multiple times in the chest. During his investigation of the crime scene, Officer Porter noticed a wrapped-up sandwich lying on the counter. Later that night, a detective processed the crime scene and lifted fingerprints throughout the store. Unfortunately, the prints on the sandwich wrapper were not usable.

¶7 The owner of the Town Pump found that approximately $300 was missing from the store. About a week after the homicide, he realized that a knife with a five-inch steel blade, which was always kept in the store, was missing. He was also able to determine by looking at cash register receipts, that the last transaction before the homicide was for ninety nine cents, the price of the sandwich on the counter.

¶8 In the weeks and months following the homicide, Vicki and Becky helped develop composite drawings of the suspect. All three of the primary witnesses, Annette, Becky, and Vicki, participated in approximately fifty photo lineups. The detectives followed up on information provided by the public, but to little avail. At one point they investigated Joseph Grosbusch, another Town Pump employee, but concluded he was not a suspect.

¶9 Between 1989 and 1997, there were no significant developments in the investigation.

3

In 1997, however, Detective Cameron received information from a confidential informant that Donald DuBray committed the homicide. DuBray was in prison for a rape conviction at the time the tip was provided. The confidential informant also told Detective Cameron that DuBray owned 1969 and 1974 red Pontiacs. Based on this information, Detective Cameron reopened the investigation. Detective Cameron learned that DuBray had been driving a 1967 red or maroon Pontiac with damage to the rear end at the time of the homicide.

¶10 At the time of Suzette's murder, DuBray lived with his girlfriend, Rose Valenzuela. Rose testified that on the night of October 6, 1986, the night of the homicide, DuBray left the apartment and did not return until early the morning of October 7, 1986. That day Rose flew to Seattle. She testified that a month or two later when DuBray found her in Seattle, he told her he had robbed the Town Pump.

¶11 As Detective Cameron continued with the investigation, more and more clues led him to suspect DuBray. DuBray was finally charged by Information with deliberate homicide, theft, and robbery in January of 1998. DuBray was convicted by a jury on all Counts. He appeals the conviction.

¶12 We address the following issues on appeal:

¶13 1. Did the District Court err when it denied DuBray's motion to dismiss on the grounds of pre-indictment delay and failure to preserve potentially exculpatory evidence?

¶14 2. Did the District Court abuse its discretion when it refused to allow expert testimony on eyewitness identification?

¶15 3. Did the District Court abuse its discretion when it allowed testimony by a witness

4

who had been previously hypnotized and refused to allow expert testimony on the effects of hypnosis on memory?

¶16    4.   Did the District Court abuse its discretion when it refused to allow expert testimony regarding the credibility of informants who are incarcerated?

¶17    5.   Did the District Court err when it denied DuBray's motion to suppress Vicki Kuhn's testimony that she identified DuBray in a photographic lineup?

¶18    6.   Did the District Court abuse its discretion in its rulings on the admissibility of testimony regarding whether Grosbusch had been positively identified as a suspect in photo lineups?

¶19    7.   Did the District Court abuse its discretion by admitting Wally Clark's fingerprint card into evidence?

¶20    8.   Did the District Court err when it denied DuBray's motion for a mistrial?

¶21    9.   Did the District Court err when it refused to give DuBray's proposed jury instruction regarding informants?

¶22    10.   Did the District Court err when it denied DuBray's motion to suppress copies of telephone recordings made between DuBray and others while DuBray was in prison?

¶23    11.   Did the District Court abuse its discretion by denying certain discovery requests?

¶24    12.   Were DuBray's due process rights violated because one of the jurors claimed to be a psychic?

¶25    13.   Did the District Court err when it denied DuBray's motion to dismiss Counts II and III as beyond the statute of limitations?

DISCUSSION

5

¶26    Did the District Court err when it denied DuBray's motion to dismiss on the grounds of pre-indictment delay and failure to preserve potentially exculpatory evidence?

¶27    DuBray first argues that the District Court should have granted his Motion to Dismiss because the State failed to timely investigate him as a suspect in Suzette's murder and failed to preserve potentially exculpatory evidence. Because this is essentially a claim that DuBray was prejudiced due to the State's pre-indictment delay, we will treat it as such.

¶28    We review a district court's decision regarding a pre-indictment delay as a question of constitutional law. *State v. Taylor*, 1998 MT 121, ¶ 18, 289 Mont. 63, ¶ 18, 960 P.2d 773, ¶ 18. We review a district court's conclusions of law to determine whether its interpretation of the law is correct. *Taylor*, ¶ 19. Our consideration of a defendant's claim that pre-indictment delay has violated his right to due process pursuant to the Fifth and Fourteenth Amendments of the United States Constitution involves a two-step process. *Taylor*, ¶ 20. First, the defendant has the burden to show that he has suffered actual and substantial prejudice from the delay. *Taylor*, ¶ 20. Then, if he has shown sufficient prejudice, we must weigh the reasons for the delay offered by the State, as well as the length of the delay, to determine whether the defendant's rights have been denied. *Taylor*, ¶ 20. We should be guided by the principle that a pre-indictment delay will lead to a violation of a defendant's due process rights if it can be said that requiring the defendant to stand trial "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." *Taylor*, ¶ 20 (citation omitted).

¶29 As we stated previously, Suzette was murdered in 1986. Nothing came of the investigation in the years following the murder until 1997, when a confidential informant told law enforcement officers that DuBray committed the homicide. Based on information provided by the confidential informant, the investigation of Suzette's murder was reopened, with DuBray as the focus.

¶30 As DuBray points out, *Taylor* requires the State to explain how the periods of inactivity comport with a conscientious and reasonable investigation. *Taylor*, ¶ 20. In *Taylor*, the State had identified a suspect it thought had committed workers' compensation fraud. *Taylor*, ¶ 5. By the time the State finally charged him, two of the defendant's medical witnesses, who could have supported his defense, had died. *Taylor*, ¶ 13. We held that the State offered no satisfactory explanation for the two-year delay. *Taylor*, ¶ 33.

¶31 DuBray argues that as in *Taylor*, here, the State provided no reason for the long period of time that elapsed between the commission of the crime and the investigation of him. As the State points out in its brief, however, the facts of *Taylor* are distinguishable from the facts of this case. As we have already stated, in *Taylor*, the State had a known suspect, yet inexplicably failed to investigate and file charges in a timely manner. Here, investigators were not made aware of DuBray's involvement in Suzette's homicide until a confidential informant tipped them off in 1997, over a decade after the homicide. Nothing in the record suggests that investigators contributed to a delay in the investigation of DuBray as a suspect.

¶32 DuBray states that as a result of the long delay he suffered substantial prejudice because certain potentially exculpatory evidence was not properly preserved. Specifically, DuBray complains that tissue under the victim's fingernails, blood samples, and hair samples

7

were not properly preserved; no record was kept of which photographs witnesses had examined, but *not* identified as a suspect; and, finally, that due to the passage of time, witnesses' memories had deteriorated.

¶33    The State points out that DuBray did not raise most of the aforementioned issues in his Motion to Dismiss before the District Court.  As we have previously held, we will not consider an issue presented for the first time on appeal.  *In re T.E.*, 2002 MT 195, ¶ 20, 311 Mont. 148, ¶ 20, 54 P.3d 38, ¶ 20.  Accordingly, we decline to entertain such arguments in this case.

¶34    The only issues DuBray properly preserved for appeal were deterioration of witnesses' memories and the lack of record keeping regarding which photographs witnesses had been shown.  DuBray argues that evidence exists that witnesses had been shown his photograph, but not identified him as the suspect.  DuBray asserts that the State's witnesses once identified Grosbusch as the suspect, but later did not support that identification.  The witnesses also could not recall eliminating DuBray's picture after viewing thousands of pictures of potential suspects.  He further argues that his alibi witnesses became confused over time.

¶35    This Court does not take allegations of pre-indictment delay lightly, and we recognize that witnesses' memories may fail after the passage of a prolonged  period of time.  However, after weighing any prejudice suffered by DuBray against the reasons for the delay and the length of the delay, we conclude that DuBray's due process rights were not violated.  No statute of limitations exists for deliberate homicide.  Section 45-1-205(1)(a), MCA.  The State's reason for the lapse of time between commission of the crime and charging DuBray

is justified.

ISSUE TWO

¶36     Did the District Court abuse its discretion when it refused to allow expert testimony on eyewitness identification?

¶37     DuBray next argues that the District Court erred by refusing to permit expert testimony on eyewitness identification. He contends that we should treat the District Court's refusal to allow this testimony as a due process violation. This, however, is not the proper standard.

¶38     Issues concerning the admissibility of evidence are within the discretion of the district court. *Cottrell v. Burlington Northern R. Co.* (1993), 261 Mont. 296, 301, 863 P.2d 381, 384. "The trial court is vested with great latitude in ruling on the admissibility of expert testimony." *Cash v. Otis Elevator Co.* (1984), 210 Mont. 319, 332, 684 P.2d 1041, 1048. The determination of the qualification and competency of expert witnesses rests largely within the trial judge, and without a showing of an abuse of discretion, such determination will not be disturbed. *Cottrell*, 261 Mont. at 301, 863 P.2d at 384.

¶39     The District Court excluded testimony of DuBray's expert on memory and eyewitness testimony, Dr. William Stratford. DuBray contends Dr. Stratford's testimony would have assisted the jury in understanding variables which affect the accuracy of identification and fact recollection, including the relationship between stress and perception, problems with unconscious transfer of memory, the relationship between a witness's apparent confidence in her memory and the actual accuracy of that memory, and why witnesses frequently incorporate into their identifications inaccurate information gained subsequent to the actual

9

observational event. DuBray represented to the District Court that Dr. Stratford would not render an opinion regarding the ultimate credibility of any witness or the accuracy of the identifications made by any witness, as would have been improper under Rules 702 and 703, M.R.Evid.

¶40 The admissibility of expert testimony is governed by Montana Rule of Evidence 702. M.R.Evid. 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

In refusing to allow Dr. Stratford to testify, the District Court reasoned that Dr. Stratford's testimony would not assist the jury in understanding the testimony of any witness and would invade the province of the jury.

¶41 DuBray argues, and we acknowledge, that a large body of research exists which demonstrates that eyewitness testimony can be unreliable. *See*, *e.g.*, Roger B. Handberg, *Expert Testimony on Eyewitness Identification: A New Pair of Glasses for the Jury*, 32 Am. Crim. L. Rev. 1013 (1995).

¶42 The Florida Supreme Court pointed out in *McMullen v. State* (1998), 714 So.2d 368, 370, three views exist on the admissibility of expert testimony on the reliability of eyewitness identification. First, some courts have taken the "discretionary" view. *McMullen*, 714 So.2d at 370. Under this view, admission of expert testimony on eyewitness identification is left to the discretion of the trial judge. *McMullen*, 714 So.2d at 370. The second view is the "prohibitory" view. *McMullen*, 714 So.2d at 371. Under the prohibitory

10

view, this type of expert testimony is expressly prohibited. *McMullen*, 714 So.2d at 371.

Under the third view, known as the "limited admissibility" view, it is an abuse of discretion

to exclude this type of expert testimony when no substantial corroborating evidence exists.

*McMullen*, 714 So.2d at 371.

¶43 In adopting the limited admissibility rule, the California Supreme Court reasoned:

> When an eyewitness identification of the defendant is a key element of the
> prosecution's case but is not substantially corroborated by evidence giving it
> independent reliability, and the defendant offers qualified expert testimony on
> specific psychological factors shown by the record that could have affected the
> accuracy of the identification but are not likely to be fully known to or
> understood by the jury, it will ordinarily be error to exclude that testimony.

*People v. McDonald* (Cal. 1984), 690 P.2d 709, 727. In light of the scholarship on the

subject of eyewitness testimony over the past decade, we agree with the California Supreme

Court's reasoning and now adopt the limited admissibility rule in Montana. It shall be an

abuse of discretion for a district court to disallow expert testimony on eyewitness testimony

when no substantial corroborating evidence exists.

¶44 Here, however, DuBray's conviction did not rest solely on the testimony of one

eyewitness. The jury also heard evidence that at the time of the homicide, DuBray drove a

car similar to the one seen at the Town Pump and that he told Rose Valenzuela he robbed

the Town Pump. Leland LaPier testified that in the early morning hours the day of the

homicide he met DuBray in Black Eagle, where DuBray wiped down the steering wheel and

then abandoned his car. Further, inconsistencies existed in the testimony of DuBray's alibi

witnesses. The foregoing are only a few examples of other evidence supporting DuBray's

conviction. Therefore, we find that the District Court did not commit error by prohibiting

11

Dr. Stratford's testimony.

ISSUE THREE

¶45     Did the District Court abuse its discretion when it allowed testimony by a witness who had been previously hypnotized and refused to allow expert testimony on the effects of hypnosis on memory?

¶46     DuBray contends that the District Court erred when it denied his motion *in limine* to exclude the testimony of Becky Hill, because hypnosis had been attempted to help her memory.  DuBray contends the District Court erred further by refusing to allow Dr. Lynn Johnson to give expert testimony regarding the effects of hypnosis on memory.

¶47     We review a district court's denial of a motion *in limine* for an abuse of discretion. *Hulse v. State, Dept. of Justice,* 1998 MT 108, ¶ 15, 289 Mont 1, ¶ 15, 961 P.2d 75, ¶ 15. "[T]he authority to grant or deny a motion *in limine* 'rests in the inherent power of the court to admit or exclude evidence and to take such precautions as are necessary to afford a fair trial for all parties.'   Thus, we will not overturn a district court's grant [or denial] of a motion *in limine* absent an abuse of discretion." *Hulse*, ¶ 15 (citation omitted).

¶48     As we have already stated, we will not overturn a district court's ruling on the admissibility of expert testimony unless there is an abuse of discretion. *Cottrell*, 261 Mont. at 301, 863 P.2d at 384.

¶49     Law enforcement officers twice tried to hypnotize Becky in an attempt to learn more details about the night of the homicide.  DuBray filed a motion *in limine* before the District Court to prohibit her testimony, stating he was concerned about the effect hypnosis may have had on her memory.  Essentially, DuBray is troubled by the phenomenon known as "memory

12

hardening." "Memory hardening affects one's ability [after hypnosis] to resolve doubts and uncertainties resulting in the subject becoming certain of his or her memories regardless of the accuracy of those memories. A subject becomes certain of his or her recall of the events without foundation for that confidence." *Stokes v. State* (Florida 1989), 548 So.2d 188, 191.

¶50 Memory hardening, however, is not a concern in this case. Despite the fact that law enforcement twice tried to hypnotize Becky, she never achieved a hypnotic state. Furthermore, the only new detail Becky remembered after the hypnosis sessions was the height of the taillights of the vehicle she saw at Town Pump prior to the homicide. Because Becky did not testify to any significant new facts she recalled through hypnosis, and, moreover, because she never achieved a hypnotic state, we conclude the District Court did not abuse its discretion by allowing her testimony.

¶51 Furthermore, we conclude that the District Court did not abuse its discretion by refusing to allow Dr. Johnson to testify as an expert witness regarding the effect of hypnosis on memory. We reiterate that Hill's memory remained substantially unchanged after the hypnosis sessions, and she did not achieve a hypnotic state. Under the circumstances, it was clearly within the court's discretion to exclude Dr. Johnson's testimony.

### ISSUE FOUR

¶52 Did the District Court abuse its discretion when it refused to allow expert testimony regarding the credibility of informants who are incarcerated?

¶53 Once again, we state that we will not overturn a district court's ruling on the admissibility of expert testimony unless there is an abuse of discretion. *Cottrell*, 261 Mont. at 301, 863 P.2d at 384.

13

¶54 At trial, the District Court excluded the testimony of DuBray's expert on incarcerated informants, Dr. Paul Lawson. In his offer of proof on the matter, counsel for DuBray stated:

> With regard to . . . Dr. Paul Lawson, his information is in the nature of educational experience, educational material provided to the jury with regard to how the informant system works, and the problems that the criminal justice system has had over the course of the American Republic with regard to utilization of witnesses who have a benefit in the outcome, whether it's a reduction of charge or whether it's a payment specifically for witness testimony, relocation, however you want to couch it.

The District Court excluded this testimony because it would invade the province of the jury. The District Court reasoned that the concept of prisoners bartering information and testimony in exchange for favorable treatment is one that is generally understood in our society. The District Court noted further that DuBray had an opportunity to cross-examine witnesses with regard to possible motivations for giving untruthful testimony.

¶55 We agree with the District Court. The subject of Dr. Lawson's proposed testimony is one which jurors are capable of understanding without the assistance of expert testimony, as provided for in Rule 702, M.R.Evid. The District Court did not abuse its discretion by excluding Dr. Lawson's testimony.

ISSUE FIVE

¶56 Did the District Court err when it denied DuBray's motion to suppress Vicki Kuhn's testimony that she identified DuBray in a photographic lineup?

¶57 Our standard of review for a district court's denial of a motion to suppress is whether the court's findings of fact are clearly erroneous, and whether those findings are correctly applied as a matter of law. *State v. Clark*, 2000 MT 40, ¶ 14, 298 Mont. 300, ¶ 14, 997 P.2d 107, ¶ 14.

14

¶58 DuBray argues that the 1997 photographic lineup during which Vicki identified DuBray as the man she saw at Town Pump the evening of the homicide should have been suppressed. We apply a two-part test to determine whether an identification should be suppressed. *State v. Higley* (1980), 190 Mont 412, 421, 621 P.2d 1043, 1049. First, we examine whether the identification procedure was impermissibly suggestive; and, if so, second, we evaluate under the totality of the circumstances whether the suggestiveness gave rise to substantial likelihood of irreparable misidentification. *Higley*, 190 Mont at 421, 621 P.2d at 1049. In *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401, the United States Supreme Court set forth five factors to evaluate whether under the totality of the circumstances, the procedure gave rise to a substantial likelihood of irreparable misidentification. The *Neil* factors are: (1) the opportunity for the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Neil*, 409 U.S. at 199-200, 93 S.Ct. at 382, 34 L.Ed.2d 401.

¶59 On January 15, 1997, at the request of Detective Cameron, Detective Franklin, an officer in Mesa, Arizona, conducted a photographic lineup with Vicki. Detective Franklin was unaware of the identities of the individuals depicted in the lineup, or which of them may have been a suspect. Prior to conducting the lineup, Detective Franklin read instructions to Vicki, informing her that a picture of the suspect may or may not be included and that a person's hair color and hair style may have changed. Vicki's husband was present during the lineup.

15

¶60     Vicki became upset and began to cry as soon as she saw the photographs. She held up two fingers to her husband, presumably indicating that the man in the second photograph was the one she saw at the Town Pump. Vicki told Detective Franklin that she was 99.9% sure she could make an identification based on the lineup, but that Detective Cameron had told her not to make an identification unless she was 100% sure. At that point, Detective Franklin left the room to call Detective Cameron to ask him how to proceed. Vicki spoke with Detective Cameron and told him that she was 99.9% sure that "number two" was the man she saw at the Town Pump. Detective Cameron informed her, "You got the right guy." Vicki then formally made her identification of "number two," Donald DuBray. Detective Franklin noted that Vicki said, "Number two, he's a bastard."

¶61     DuBray argues that the identification was impermissibly suggestive for the following reasons: Detective Cameron advised Vicki "You got the right guy" before she formally made her identification; the individuals depicted do not look like the composite drawing that had been done of the suspect and they do not look like each other; Vicki recognized one of the individuals as someone she knew; and, Joseph Grosbusch, who previously had been investigated in the case, was not depicted.

¶62     Notwithstanding DuBray's arguments, we find that the lineup was not impermissibly suggestive. We make little of DuBray's suggestion that the identification was tainted by Vicki's telephone conversation with Detective Cameron. Vicki had signaled to her husband that the man in photo number two was the man she saw at the Town Pump, and she told Detective Cameron that she was 99.9% certain of the identification before he told her she had the right guy.

16

¶63 Contrary to DuBray's assertion, the men depicted in the lineup shared similarities in appearance and generally fit the description of the suspect Vicki gave to the police shortly after the homicide, which was used to help make the composite drawing. Even though Vicki recognized one of the men depicted as someone she knew, nothing in the record suggests that Detective Cameron was aware of this fact when he chose the photographs for the lineup, or that Vicki was able to immediately rule him out as a suspect based on the fact that she knew him.

¶64 DuBray's assertion that the lineup was impermissibly suggestive because it did not include a picture of Joseph Grosbusch, is also without merit. DuBray claims that in 1989, Vicki made a positive identification of Grosbusch in a photo lineup. This, however, is not true. In the 1989 lineup, Vicki stated that the picture of Grosbusch was "as close as I'm going to get" to identifying the suspect. While Vicki's statement leaves room for interpretation as to whether it constituted a positive identification of Grosbusch, it was hardly an *unequivocal* identification of Grosbusch. Furthermore, as we noted above, at the outset of the 1997 lineup, Detective Franklin admonished Vicki that the suspect may or may not be included in the lineup. Nothing about the absence of Grosbusch's photo in the lineup caused the lineup to be impermissibly suggestive.

¶65 Because we find that the lineup was not impermissibly suggestive, we need not proceed to part two of the analysis to determine whether, under the totality of the circumstances, the suggestiveness gave rise to a substantial likelihood of irreparable misidentification.

ISSUE SIX

17

¶66     Did the District Court abuse its discretion in its rulings on the admissibility of testimony regarding whether Grosbusch had been positively identified as a suspect in photo lineups?

¶67     DuBray next argues that the District Court became DuBray's adversary by virtue of its rulings on the admissibility of testimony regarding whether Grosbusch had been positively identified as a suspect in photo lineups.  We review evidentiary rulings for an abuse of discretion.  *State v. MacKinnon*, 1998 MT 78, ¶ 12, 288 Mont. 329, ¶ 12, 957 P.2d 23, ¶ 12.

¶68     DuBray raises concern about two specific rulings.  The first ruling occurred during DuBray's counsel's cross-examination of Detective Renman:

| Q [Mr. Olson]: | And they should have, shouldn't they, when they had photo lineups from the three key eyewitness who identified his photograph – |
|---|---|
| Mr. Light: | I'm going to object.  That's about the third time that he's misrepresented what the photo lineup and the evidence thus far is.  He's done it about three times and I've let it go. |
| The Court: | I'm going to sustain the objection. |

¶69     The second ruling DuBray argues was improper occurred during the State's redirect of Detective Renman:

| Q [Mr. Light]: | Officer, if you were sitting in a photo lineup and a witness told you it's between two and five, number 5 I can't say 100 percent but that's as close as I'm going to get, would you say that's a positive identification, officer? |
|---|---|
| A [Det. Renman]: | No. |
| Mr. Olson: | Objection, leading.  Objection calls for speculation. |

The Court:        Overruled.

¶70    DuBray asserts that in the two aforementioned rulings, the District Court invaded the province of the jury by adopting the State's theory that Grosbusch had not been positively identified through a photo lineup. Whether Grosbusch had been positively identified as a suspect was at issue during the trial.

¶71    In support of this argument, DuBray cites us to *Gass v. United States* (D.C. Cir. 1969), 416 F.2d 767. At issue in *Gass* was the authenticity of some of the evidence. The *Gass* court held that although testimony supporting the authenticity of the evidence was not as clear-cut as it could have been, the evidence still met the requirements for admissibility, and that the weight to be attached to the evidence was a matter for the jury. *Gass*, 416 F.2d at 772.

¶72    *Gass* does not support DuBray's argument. Rather, *Gass* supports the District Court's rulings on the testimony. In making the rulings, the District Court did not become DuBray's adversary and did not comment on the evidence. In the first instance, the District Court actually stopped DuBray's counsel from inappropriately commenting on the evidence. In the second instance, the District Court permitted the witness to give his testimony regarding evidence that was in dispute. Thus, we conclude that the District Court did not abuse its discretion in its rulings on the admissibility of testimony regarding whether Grosbusch had been positively identified as a suspect in photo lineups.

## ISSUE SEVEN

¶73    Did the District Court abuse its discretion by admitting Wally Clark's fingerprint card into evidence?

19

¶74 The determination of the adequacy of foundation for the admission of evidence is within the discretion of the trial court and will not be overturned absent a clear abuse of discretion. *State v. Christenson* (1991), 250 Mont. 351, 359, 820 P.2d 1303, 1308.

¶75 Part of DuBray's defense at trial included casting suspicion on others. One person DuBray pointed to as the possible killer was Wally Clark. During its investigation, the State compared fingerprints found at the crime scene to the prints of various people, including Wally Clark. The State sought to introduce evidence regarding Wally Clark's fingerprints at trial.

¶76 The State first called Detective Cameron to lay the foundation for Wally Clark's fingerprint card. Detective Cameron testified that he retrieved the fingerprint card from the Cascade County Sheriff's Office and submitted it to the State Crime Lab. At that point, DuBray's counsel asked to *voir dire* Detective Cameron. During the *voir dire*, Detective Cameron stated he had not personally taken the prints from Wally Clark. DuBray's counsel objected to admission of the fingerprint card because the chain of custody had not been established and as such there was a lack of foundation. The District Court sustained the objection.

¶77 The State then called Michelle Mara, a records clerk for the Cascade County Sheriff's Office, as a witness. She testified that it was her job to maintain the records and files in the sheriff's office, and that the exhibit at issue was indeed a fingerprint card kept in the records in the regular course of business. Again, DuBray's counsel asked to *voir dire* the witness. During the *voir dire*, Mara stated that she did not work at the sheriff's office at the time Wally Clark's fingerprints were taken in 1987. Based on her statement, DuBray's counsel

20

again objected on the basis of lack of foundation. This time, the District Court overruled the objection.

¶78 The authentication or identification of evidence is governed by Rule 901, M.R.Evid., which states that "admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(a), M.R.Evid. The rule goes on to provide examples of authentication or identification conforming with the requirements of Montana's Rules of Evidence. One such illustration states:

> Public records or reports. Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept.

Rule 901(b)(7), M.R.Evid.

¶79 Law enforcement is required to photograph and fingerprint any person charged with the commission of a felony, and to preserve such prints. Section 44-5-202(3)(a), MCA. As such, the fingerprints of Wally Clark are a public report or record and were properly authenticated at trial, as illustrated by Rule 901(b)(7), M.R.Evid. DuBray has provided no argument that the evidence is not what its proponent claims it to be. We conclude the District Court did not abuse its discretion.

ISSUE EIGHT

¶80 Did the District Court err when it denied DuBray's motion for a mistrial?

¶81 A district court's determination of whether to grant a motion for a mistrial must be based on whether the defendant has been denied a fair and impartial trial. *State v. Herrman*, 2003 MT 149, ¶ 36, 316 Mont. 198, ¶ 36, 70 P.3d 738, ¶ 36. This Court's standard of review

21

of a grant or denial of a motion for mistrial is whether the court abused its discretion. *Herrman*, ¶ 36.

¶82    DuBray next argues that the District Court erred by denying his motion for a mistrial. DuBray's motion was premised on his assertion that the State had not disclosed the benefits given to witness Leland LaPier for his cooperation with the prosecution. Prior to the trial, and on the motion of DuBray's counsel, the District Court ordered the State to provide DuBray with the names of any individuals who received a benefit in connection with DuBray's case. The State disclosed that Rose Valenzuela was the only person who had received benefits with regard to her cooperation. DuBray asserts, however, that at the trial, Leland LaPier testified that he was benefitted by the state in relation to his assistance in DuBray's prosecution. DuBray contends that LaPier benefitted on two occasions: first, that the State dismissed charges against LaPier for felony criminal endangerment; and second, that the State dismissed parole violation charges against him.

¶83    DuBray contends that the District Court should have granted his motion for a mistrial because in failing to disclose the benefits LaPier allegedly received, the State withheld exculpatory information in violation of *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Suppression by the prosecution of material evidence favorable to the accused violates the defendant's Fourteenth Amendment guarantee of due process. *Brady*, 373 U.S. at 86, 83 S.Ct. at 1196, 10 L.Ed.2d 215. The prosecution may violate the principles set forth in *Brady* by failing to disclose agreements with a prosecution witness in exchange for testimony. *Gollehon v. State*, 1999 MT 210, ¶ 14, 296 Mont. 6, ¶ 14, 986 P.2d 395, ¶ 14. Promises made to a witness in exchange for testimony go directly to the

22

credibility of the witness. *Gollehon*, ¶ 14. To establish a *Brady* violation, the petitioner must establish that: (1) the State possessed evidence, including impeachment evidence, favorable to the defense; (2) the petitioner did not possess the evidence nor could he have obtained it with reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different. *Gollehon*, ¶ 15.

¶84    When Detective Cameron first approached LaPier for information regarding the investigation of DuBray, LaPier provided limited information and then stated he would save the rest of the information for a "rainy day." Subsequently, LaPier was charged with criminal endangerment and other offenses. Cascade County Attorney Brant Light testified that he dismissed the charge against LaPier, not in exchange for cooperation in the DuBray investigation, but because he feared that LaPier would dry up as a source if prosecuted.

¶85    Several months later, LaPier was arrested for a probation violation. DuBray had told LaPier he knew LaPier had talked to investigators and LaPier was afraid DuBray would retaliate. LaPier requested a meeting with one of the prosecutors in DuBray's case. During the meeting, LaPier provided the prosecution with more information about the night of the Town Pump homicide. The meeting was video taped, and DuBray's counsel was given a copy of the tape. After the meeting, out of concern for LaPier's safety, the State placed LaPier in the Intensive Supervision Program.

¶86    While it is true that LaPier may have benefitted from the State's decisions regarding his criminal endangerment charge and his probation violation, no evidence exists which indicates that the benefits were given in exchange for information. Based on the record

23

before us, we conclude that any benefit given to LaPier was purely incidental. Moreover, at trial, DuBray's counsel took the opportunity to cross-examine LaPier about what he had to gain by cooperating with the State. The facts here do not give rise to a violation under *Brady* and *Gollehon*.

## ISSUE NINE

¶87    Did the District Court err when it refused to give DuBray's proposed jury instruction regarding informants?

¶88    We review claims of instructional error in a criminal case to determine whether the jury instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case. *State v. Long* (1995), 274 Mont. 228, 232, 907 P.2d 945, 947.

¶89    DuBray proposed the District Court instruct the jury regarding testimony by an informant as follows:

> The testimony of an informant, someone who provides evidence against someone else for money, or to escape punishment for his or her misdeeds or crimes, or for other personal reason or advantage must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated.
> Leland LaPier, Rose Valnezuela, and Wade Beston may all be considered informants in this case.
> The jury must determine whether the informer's testimony has been affected by self-interest or by the agreement he or she has with the State, or by his or her own interest in the outcome of the case, or by prejudice against the defendant.

The State objected and the District Court refused DuBray's proposed instruction.

¶90    Instead, the District Court read to the jury the State's proposed instruction which addressed witness credibility. The instruction provided:

> You are the sole judges of the credibility, that is the believability, of all

24

the witnesses testifying in this case, and of the weight, that is importance, to be given their testimony. In judging the effect of evidence you must be fair and impartial and not arbitrary. While you have discretion in judging the effect of evidence, you must exercise that discretion in accordance with these instructions.

. . . .

In determining what the facts are in the case, it may be necessary for you to determine what weight should be given to the testimony of each witness. To do this you should carefully consider all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to indicate whether a witness is worthy of belief.

You may consider:

1. The appearance of each witness on the stand, his manner of testifying, his apparent candor or lack of candor, his apparent fairness or lack of fairness, his apparent intelligence or lack of intelligence, his knowledge and means of knowledge on the subject upon which he testifies.

2. Whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice.

3. The extent to which each witness is either supported or contradicted by other evidence in the case.

4. The capacity of the witness to perceive and communicate.

5. Proof that the witness has a bad character for truthfulness.

If you believe that any witness has willfully testified falsely as to any material matter in this case, you must reject such of his testimony as you believe to have been false and you have the right to view the rest of his testimony with distrust and in your discretion disregard it, unless, after examination of all the evidence, you find such testimony worthy of belief. You need not find a witness's testimony false if he or she while testifying:

1. Unintentionally commits an error in his or her testimony, or

2. Is unintentionally mistaken as to some matters or facts about which he or she testifies, or

3. Gives evidence concerning matters not material in the case without intention of deceiving the Court or Jury.

¶91 DuBray argues that without his proposed instruction, the jury instructions were incomplete. DuBray cites us to *State v. Grimes*, 1999 MT 145, 295 Mont. 22, 982 P.2d 1037, in support of this argument. In *Grimes*, we held that "when a government informant motivated by personal gain rather than some independent law enforcement purpose provides

testimony, a cautionary instruction is the more prudent course of action." *Grimes*, ¶ 45. We further held in *Grimes* that "when a trial court refuses a proposed cautionary instruction, the standard of prejudice is whether the testimony was crucial to the State's case in light of other evidence." *Grimes*, ¶ 46.

¶92 In *Grimes*, we mistakenly stated that Montana had no prior case law addressing cautionary instructions for "jailhouse informants." *Grimes*, ¶ 43. We had, in fact, addressed the issue in *State v. Long*, 274 Mont. 228, 907 P.2d 945, and its predecessors. In *Long* we stated that to constitute reversible error, the district court's actions must affect substantial rights of the party. *Long*, 274 Mont. at 234, 907 P.2d at 948. In that case the District Court gave the jury the same instruction as was given here, which we recited above. *Long*, 274 Mont. at 232-33, 907 P.2d at 947-48. We concluded in *Long* that the instruction "adequately address[ed] witness motive, bias or prejudice, and bad character for truthfulness." *Long*, 274 Mont. at 234, 907 P.2d at 949. We held that "[W]here the proposed instruction is adequately covered by a given instruction, it is not error for the trial court to refuse the proposed instruction," and concluded that the defendant's substantial rights had not been affected. *Long*, 274 Mont. at 234-35, 907 P.2d at 949.

¶93 Our holding in *Grimes* is not inconsistent with our holding in *Long*. Here, the District Court did give a cautionary instruction which addressed the credibility of informants, as called for in *Grimes*. And, as required by *Long*, the instruction adequately addressed witness motive, bias or prejudice, and bad character for truthfulness. We conclude that the District Court fully and fairly instructed the jury, and did not commit error.

ISSUE TEN

26

¶94    Did the District Court err when it denied DuBray's motion to suppress copies of telephone recordings made between DuBray and others while DuBray was in prison?

¶95    Our standard of review for a district court's denial of a motion to suppress is whether the court's findings of fact are clearly erroneous, and whether those findings are correctly applied as a matter of law. *Clark*, ¶ 14.

¶96    At trial, the State introduced into evidence recordings of telephone conversations between DuBray and others while he was incarcerated in state and federal facilities. DuBray argues that the recordings were admitted into evidence in violation of state and federal wiretap laws.

¶97    Monitoring and recording telephone conversations is a search within the meaning of the Fourth Amendment. *Katz v. United States* (1967), 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576. However, in *State v. Scheetz* (1997), 286 Mont. 41, 46, 950 P.2d 722, 724-25, we held that, "Where no reasonable expectation of privacy exists, there is neither a 'search' nor a 'seizure' within the contemplation of the Fourth Amendment of the United States Constitution or Article II, Section 11 of the Montana Constitution."

¶98    The recording of communication is governed by both state and federal statute. Section 45-8-213, MCA, provides, in relevant part, that a person commits the offense of violating privacy in communication if the person purposely or knowingly:

> (c) records or causes to be recorded a conversation by use of a hidden electronic or mechanical device that reproduces a human conversation without the knowledge of all parties to the conversation. This subsection (1)(c) does not apply to:
> (i) elected or appointed public officials or employees when the transcription or recording is done in the performance of official duty;
> (ii) persons speaking at public meetings; or

27

(iii) persons given warning of the transcription or recording.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, also prohibits unauthorized, intentional interception of telephone conversations. The Act does, however, provide for several exceptions, including when a party to a communication consents to the interception. 18 U.S.C. § 2511(2)(c).

¶99    At the federal facilities in which DuBray was incarcerated, he received orientation and a handbook informing him that his telephone conversations were subject to monitoring and recording. DuBray also signed a document at each facility acknowledging his understanding of the monitoring policy. The monitoring and recording policy was also posted near inmate telephones.

¶100   The state facility in which DuBray was incarcerated also notified inmates of its practice of monitoring and recording inmate telephone conversations. Stickers announcing the practice were placed on all inmate telephones, and the automated telephone system played a taped message each time an inmate placed a call, informing all parties to the call that their conversation was being monitored. Further, on two occasions, DuBray informed the party with whom he was speaking that his calls were being monitored.

¶101   We hold that because DuBray was aware that his telephone conversations were subject to monitoring and recording, no violation of § 45-8-213, MCA, or Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, occurred, and the recordings were properly admitted into evidence. DuBray consented to the recordings as permitted under § 45-8-213(1)(c)(iii), MCA, and 18 U.S.C. § 2511(2)(c).

ISSUE ELEVEN

28

¶102   Did the District Court abuse its discretion by denying certain discovery requests?

¶103   We review orders granting or denying discovery for an abuse of discretion. *State v. Duffy*, 2000 MT 186, ¶ 18, 360 Mont. 381, ¶ 18, 6 P.3d 453, ¶ 18.

¶104   DuBray underwent a polygraph test, and was given a copy of the polygraph report. DuBray filed a discovery motion requesting information including the type of polygraph instrument used, its work service history, and notes of the examiner.  In his brief in support of his discovery motion, DuBray argued he needed the information in anticipation that the State might use the polygraph test for impeachment purposes.

¶105   The District Court properly noted that polygraph evidence is inadmissible in Montana court proceedings. *See State v. Staat* (1991), 248 Mont. 291, 811 P.2d 1261.  The District Court found that the information requested was therefore irrelevant and denied DuBray's motion.  Since polygraph results are inadmissible, DuBray's argument that he needed the information for impeachment purposes was without merit.  We agree with the District Court's reasoning and find that it did not abuse its discretion in denying DuBray's motion regarding polygraph evidence.

¶106   DuBray next argues that the District Court improperly denied his discovery motion requesting the criminal history records of each of the State's witnesses.  DuBray argued he was entitled to the information for impeachment purposes. Rule 608(b), M.R.Evid., provides in part that specific instances of conduct may "if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness of untruthfulness . . . ."

¶107   In denying the motion, the District Court reasoned that, pursuant to Rule 609,

M.R.Evid., information of prior convictions is generally not admissible for impeachment purposes and that the information sought was not relevant. The District Court stated that a "wholesale request for production of criminal records of all of the State's witnesses in order to interview and impeach, without any explanation or substantiation of the evidence sought or the potential use to be made of such evidence against each witness, falls far beyond the intended purpose of the open discovery requirements in criminal cases."

¶108 We agree with the District Court. While it is true that information about a witness' prior convictions may be admissible under certain circumstances, DuBray did not justify his "wholesale request" for information. We conclude that the District Court did not abuse its discretion when it denied DuBray's discovery motion regarding criminal records of the State's witnesses.

¶109 DuBray's final argument regarding his discovery requests involves the identity of a confidential informant. The District Court denied DuBray's motion to require the State to reveal the identity of the confidential informant.

¶110 Disclosure of an informant's identity requires "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro v. United States* (1957), 353 U.S. 53, 62, 77 S.Ct. 623, 628-29, 1 L.Ed.2d 639. Disclosure "must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors. *Roviaro*, 252 U.S. at 62, 77 S.Ct at 629, 1 L.Ed.2d 639.

¶111 Disclosure of an informant's identity is also governed by Montana statute. Section

30

46-15-324(3), MCA, states:

> Disclosure of the existence of an informant or the identity of an informant who will not be called to testify is not required if:
> (a) disclosure would result in substantial risk to the informant or to the informant's operational effectiveness; and
> (b) the failure to disclose will not infringe on the constitutional rights of the accused.

¶112 We applied the balancing test set forth in *Roviaro* in *State v. Campbell* (1992), 254 Mont. 425, 838 P.2d 427, and *State v. McLeod* (1987), 227 Mont. 482, 740 P.2d 672. Under the balancing test, the defendant bears the burden of showing the need for disclosure, and the need must be sufficient to override the government's interest in protecting the name of the informant. *Campbell*, 254 Mont. at 430, 838 P.2d at 430. "Mere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure . . . . The defendant must show that the informant's testimony would significantly aid in establishing an asserted defense." *McLeod*, 227 Mont at 487, 740 P.2d at 675 (quoting *United States v. Kerris* (11ᵗʰ Cir. 1984), 748 F.2d 610, 614).

¶113 The District Court found, and we agree, that DuBray offered nothing concrete or substantive to establish that disclosure of the informant's identity is necessary for the Defendant to properly prepare for trial, that the informant may possess exculpatory information, or that the informant may have been involved in the homicide. The informant in this case did not even testify. DuBray fails to persuade us that disclosure of the identity of the confidential informant was warranted in this case.

31

## ISSUE TWELVE

¶114   Were DuBray's due process rights violated because one of the jurors claimed to be a psychic?

¶115   The decision of a district court judge as to the impartiality of a jury should not be set aside unless there is clear abuse of discretion.  *State v. McMahon* (1995), 271 Mont. 75, 78, 894 P.2d 313, 315.

¶116   On the morning of the second day of the jury's deliberations the foreman and two other jurors approached the bailiff with their concerns about another juror.  They informed the bailiff that one of the jurors who had strong opinions in the case claimed to be a psychic. The bailiff related this information to the District Court, prosecutor, and defense counsel.

¶117   After discussing the situation, the parties agreed the court should question the foreman.  With counsel present, the court and foreman engaged in the following dialogue:

| | |
|---|---|
| The Court: | [I]s there a juror who is indicating an unwillingness to base his or her decision on the evidence that was presented in Court and the law as was instructed? |
| The Witness: | I personally do not know that for certain. |
| . . . . | |
| The Court: | Based on the information you've received, you said it wasn't your personal knowledge, but did that information indicate that that particular juror was not willing to base his or her decision on the law as instructed and the evidence presented in Court? |
| The Witness: | I can't evaluate that. |
| . . . . | |
| The Court: | All right.  Well, let me just ask you this: Do you think that the jury as constituted with the present state of deliberations, can |

resolve whatever the issues are that are outstanding and arrive at a verdict in this case.

The Witness: I'd have to ask a question to respond to that. We have not come to a decision at this point.

The Court: Right.

The Witness: And I don't know if that's normal or not normal with the amount of time for deliberation. The individual that is the subject of all of this is not a single cause for us not coming to a decision at this point.

¶118 Counsel and the court continued to discuss the situation without the foreman present. DuBray's counsel and the prosecutor agreed that no problem existed and requested the court reiterate to the foreman that the jury move forward with deliberations. The court then called the foreman back to the courtroom and instructed him to return to the jury room and allow deliberations to move forward. The court advised the foreman to contact the bailiff again if the jury's ability to reach a verdict hangs on a specific juror's inability to base a decision on the law and facts of the case.

¶119 Even though DuBray's counsel helped the District Court formulate its response to the situation, DuBray now claims his rights were violated. However, nothing in the record indicates that the juror claiming to be a psychic based her strong opinions about the case on her psychic powers. "It is only where jurors form fixed opinions of the guilt or innocence of the defendant which they would not be able to lay aside and render a verdict solely on the evidence presented in court that they become disqualified as jurors." *McMahon*, 271 Mont. at 78, 894 P.2d at 315. We conclude that DuBray's right to a fair and impartial jury was not violated.

¶120   Did the District Court err when it denied DuBray's motion to dismiss Counts II and III as beyond the statute of limitations?

¶121   Whether the district court has correctly applied the statute of limitations is a question of law. *Hollister v. Forsythe* (1995), 270 Mont. 91, 93, 889 P.2d 1205, 1206. We review questions of law to ensure the trial court's application of the law was correct. *Hollister*, 270 Mont. at 93, 889 P.2d at 1206.

¶122   DuBray's final argument on appeal is that he should not have been charged with Counts II and III, for robbery and theft, because the statute of limitations had run. Pursuant to § 45-1-205, MCA, a five-year statute of limitations applies to Counts II and III. The crimes with which DuBray was charged were committed in October of 1987; DuBray was not charged until January of 1998.

¶123   The District Court rejected DuBray's statute of limitations argument, concluding that DuBray's out-of-state incarceration during the years between the commission of the crimes and the filing of the charges against him tolled the limitations period. Section 45-1-206(2), MCA, provides that the limitations period does not run during "any period in which the offender is not usually and publicly resident within this state or is beyond the jurisdiction of this state." In *State v. Stillings* (1989), 238 Mont. 478, 778 P.2d 406, we applied this provision to criminal defendants incarcerated out-of-state. In that case, we concluded that time spent incarcerated out-of-state is not counted against the running of the statute of limitations period. *Stillings*, 238 Mont. at 484, 778 P.2d at 409.

¶124   DuBray was moved to an out-of-state federal prison in 1991 after being convicted of

a felony offense on the Blackfeet Indian Reservation. He was still incarcerated out-of-state at the time he was charged. DuBray, who is Native American, asserts that a non-Indian convicted of the same offense on the Blackfeet Indian Reservation would be incarcerated in a Montana facility, not an out-of-state federal prison. DuBray argues that, under the circumstances, by tolling the statute of limitations while he was incarcerated out-of-state, he was denied equal protection under the law.

¶125 We note that DuBray failed to raise his equal protection argument before the District Court. This Court has consistently held that it will not consider issues raised for the first time on appeal. *In re T.E.*, ¶ 20. "As a general rule, we do not consider an issue presented for the first time on appeal because it is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider." *In re T.E.,* ¶ 20. Accordingly, we decline to address DuBray's equal protection argument.

¶126 We affirm.

/S/ JIM REGNIER

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ JIM RICE